[Civ. No. 30733. Second Dist., Div. Four. July 17, 1968.]

THE PEOPLE ex rel. DEPARTMENT OF PUBLIC
WORKS, Plaintiff and Respondent, v. FLINTKOTE
COMPANY, Defendant and Appellant.

98

Musick, Peeler & Garrett, Donald J. Drew and Richard D. Dear for Defendant and Appellant.

Harry S. Fenton, R. B. Pegram, Joseph A. Montoya, Richard L. Franck, Charles E. Spencer, Jr., and Robert W. Vidor for Plaintiff and Respondent.

FILES, P. J.—This proceeding in eminent domain was commenced by the Department of Public Works for the State of California on July 20, 1964, to acquire for freeway purposes a portion of defendant's real property located in the City of Irwindale. The property taken is a part of a larger parcel being used by defendant for the mining and processing of rock, sand and gravel.

The trial commenced on August 30, 1965, and resulted in a jury verdict awarding damages which defendant deems inadequate.

This appeal from the judgment on behalf of defendant calls for review of two claimed errors of law: (a) the exclusion of the testimony of an engineer as to the economic feasibility of underwater mining, and (b) the refusal of the trial court to give a requested instruction as to the cost of relocating a conveyer system. The facts will be stated only insofar as they are necessary to an understanding of the legal issues.

*The Exclusion of the Engineer's Testimony*

The issue concerns only the amount to be awarded for the taking of Parcel 3A (Reamended) consisting of approximately 13 acres, and the amount of the severance damages.[1]

---

[1]The claimed errors do not affect the value of the other parcels. The jury's verdict found severance damages resulting from the taking of all parcels in a lump sum.

The parties have been in general agreement as to the method of valuation. There have been no sales of comparable property; thus a capitalization of income method was used by both sides in determining value of the minable land. The deposit of rock, sand and gravel on the subject property is at least 600 feet in depth. The top 185 feet are above water level and the next 415 feet are below water level. As of the time of trial there had been no underwater mining on the subject property and there was no equipment for it on the property. It was stipulated that "it is physically feasible to mine rock, sand and gravel on the subject property to a depth of at least 415 feet below water." The issue upon which the parties differed was the economic feasibility of underwater mining.

Defendant's valuation witness, Laurence Sando, relied upon the opinion of Charles Mackintosh, a consulting engineer, that it was economically feasible to mine as far as 415 feet underwater, and that underwater excavation was less expensive than excavation above water. Mr. Sando's capitalization study was based upon those premises.

Plaintiff's valuation witness, C. Bernard White, was both a civil engineer and an appraiser. Mr. White was of the opinion that underwater mining was much more expensive. In his opinion the rent per ton between water level and 85 feet below water would be only one-third of the rent which would be earned for tonnage above water; and he concluded that no net rent should be attributed to material which was more than 85 feet below water.

This difference in opinion as to the economic feasibility of underwater mining contributed to the great disparity in the respective opinions of the appraisers as to the value of Parcel 3A (Reamended) and the larger property from which it was severed. Their conclusions and the jury's findings were as follows:

|  | Mr. White (for plaintiff) | Mr. Sando (for defendant) | Jury |
|---|---|---|---|
| Value of parcel taken | $271,730 | $759,000 | $340,000 |
| Severance damages | 305,100 | 989,000 | 344,000 |

At the valuation trial defendant called as its first witness Charles Mackintosh, a consulting civil engineer. After he had stated his professional training and experience, he was asked what steps he had taken to prepare himself to render an opinion in this case. There was an objection by plaintiff, fol-

lowed by a lengthy argument, at the conclusion of which the court said:

"I am suggesting to you to withdraw your witness at this time for the purpose of putting on your appraiser.

"It is not that the Court is precluding Mr. Mackintosh's testimony. It is only as to the time period; it is to be put on after the Court is in a better position to make a determination on the evidence of the appraiser."

Defendant then called Mr. Sando, a qualified real estate appraiser, who described to the jury his study of the defendant's property and his computation of the income to be derived from the production of rock, sand and gravel on the property, as a basis for his appraisal of its value. In this computation he used as a fair measure of rent the sum of $.25 per ton, both for the tonnage above water and that below water to a depth of 600 feet below the surface of the land. Mr. Sando testified that he had inspected mining properties in the San Francisco Bay area and Nevada, had discussed the problem with various people in the industry, and had received a detailed report from Mr. Mackintosh on mining underwater, all of which led him to believe that such mining was economically feasible.

After Mr. Sando had testified, defendant recalled Mr. Mackintosh, who was permitted to testify concerning the various kinds of machines used for underwater mining. He produced a photograph of a bucket ladder dredge which he said was capable of mining 150 feet below water level, and described its operation. He said a manufacturer had given him a price on a hydraulic suction dredge which would excavate 400 cubic yards per hour at a depth of 415 feet below water. He explained that no such dredge was in existence at that time, but that all of the components were in existence except the ladder, which would be made to order in the desired length. He added that such equipment is never assembled at the factory, but the parts are shipped to the mining site and assembled there. Then the witness was asked if he had an opinion about the relative costs of underwater mining with the various machines which he had described. To this, plaintiff's counsel objected upon the ground that the subject matter was hypothetical and speculative. After extensive argument by counsel, the court pointed out that defendant's valuation witness, Sando, had given an appraisal based upon information

obtained from Mr. Mackintosh, and that it was unnecessary to produce Mackintosh in court to lay a foundation for Sando's opinion. The court concluded ''that it is not foundational and necessarily [*sic*] upon the defendant's case in chief, but that it is testimony which would be received in rebuttal on the People's case . . . The objection will be sustained.''

Defendant then asked Mackintosh if he had formed an opinion as to the economic feasibility of mining below water upon the subject property. Objection by the People was sustained. The court then admonished defendant's counsel that it was unnecessary to pursue that line of questioning, in view of the court's previous rulings. Outside the presence of the jury defendant made an offer of proof, describing in detail Mr. Mackintosh's opinion concerning the costs of operating the various kinds of equipment underwater and concluding that it would be less costly to mine with a hydraulic dredge to a depth of 415 feet below water than to mine above water.

Following Mr. White's testimony for the plaintiff, defendant called Mr. Mackintosh in rebuttal and asked him for his opinion as to the depth to which it would be economically feasible to mine on the subject property. Plaintiff objected upon the ground that the question was not proper rebuttal. Counsel argued the matter at length, and then the court sustained the objection without comment. Defendant thereupon rested.

*Admissibility of the Engineer's Testimony*

■ Evidence as to the economic feasibility of underwater mining on the subject property was relevant to the issue of valuation in this case.

■ ''Under section 1249 of the Code of Civil Procedure the measure of compensation for property taken is its market value, which is to be determined by a consideration of all the uses to which it is adapted and for which it is available. [Citations.] ■ In this connection, the highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future is to be considered, not as the measure of value, but to the extent that the prospect of such use affects the market value of the land; however, elements affecting value which, while possible, are not reasonably probable, should be excluded. [Citations.]

■ Accordingly, where it is not shown that a suggested use would be profitable, or where it appears that the operations cannot be carried on except at a loss, the prospect of use for

such a purpose is not a proper element of value." (*People* v. *Ocean Shore R.R., Inc.*, 32 Cal.2d 406, 425-426 [196 P.2d 570, 6 A.L.R.2d 1179].)

In the case at bench there is a conflict of opinion as to (a) whether it is economically feasible at all to mine more than 85 feet underwater, and (b) what is the net rental attributable to the material which is less than 85 feet below water. Any informed opinion on either subject must rest upon proper assumptions as to the costs of underwater mining.

In a variety of situations courts have admitted opinion evidence from witnesses who were not appraisers in order to establish facts which the appraiser assumed to be true as a basis for his opinion as to value.

In *Pacific Gas & Elec. Co.* v. *W. H. Hunt Estate Co.*, 49 Cal.2d 565 [319 P.2d 1044], which involved the taking of a power line easement, the Supreme Court held it proper to receive testimony regarding the increased cost of irrigating underneath the power lines. This evidence was offered "only as an element to be considered by the expert in forming his opinion as to severance damages." (49 Cal.2d at p. 574.)

Similar evidence had been held admissible in *City of Los Angeles* v. *Frew*, 139 Cal.App.2d 859, 866 [294 P.2d 1073]. (Overruled on another point in *County of Los Angeles* v. *Faus*, 48 Cal.2d 672, 682 [312 P.2d 680].)

In *City of Los Angeles* v. *Cole*, 28 Cal.2d 509, 519 [170 P.2d 928], the Supreme Court said that the testimony of an architect and structural engineer was admissible to prove the geology and physical characteristics of the property, as facts affecting the use to which it could be put. The exclusion of such testimony in that case, though error, was held not to have been prejudicial.

In *People* ex rel. *Dept. Pub. Wks.* v. *Arthofer*, 245 Cal.App. 2d 454, 469 [54 Cal.Rptr. 878], the plaintiff called an expert on city planning to express the opinion that there was no reasonable probability that defendant's property would be rezoned from R1 to R3. The appellate court remarked that the admission of that opinion "appears to have been a fair exercise of [the trial court's] discretion."

In *County of Santa Clara* v. *Ogata*, 240 Cal.App.2d 262, 269 [49 Cal.Rptr. 397], defendant produced two city officials who expressed the opinion, based upon their knowledge of the city's zoning practices, that the subject property could be rezoned as a service station site. This evidence was held to

constitute a proper foundation for the opinion of the defendant's appraiser, who appraised the property as a potential service station site.

In the case at bench, Mr. Mackintosh was permitted to describe the methods of underwater mining; but all of his proffered testimony concerning the costs of such operations, either in dollars or in relation to the cost of dry land mining, was consistently excluded. The damage to defendant's case is readily apparent. A conflict of opinion as to mining costs contributed much to the disparity of the opinions of the two appraisers as to the value of the property. Plaintiff had a witness qualified both as a civil engineer and an appraiser, who had personally investigated the economic feasibility of underwater mining, and who offered persuasive reasons in support of his opinions. Defendant had prepared to present opinions directed to the same issues, but using two witnesses. Defendant's appraiser could tell the jury what opinions of Mr. Mackintosh he had relied upon for his capitalization study. But in the face of an attack by another engineer who held different views, only Mackintosh could support his own opinions with an explanation of the underlying data and his reasons, which could give his opinions credibility. The Mackintosh testimony, as indicated by defendant's offer of proof, should have been admitted as a part of defendant's case in chief on the issue of valuation. The exclusion of so vital a part of defendant's case compels a retrial.

### Instruction Regarding the Conveyer System

The new freeway cuts off the southeasterly corner of defendant's property. In order to provide access between the two portions, plaintiff is constructing an 8′ x 8′ concrete box culvert under the freeway. Defendant's processing plant is located northwest of the freeway. Before construction of the freeway, rock and gravel were carried to the processing plant by a conveyer system. Defendant's valuation witness, Mr. Sando, testified that after the freeway is built it will be necessary to relocate the conveyer system so that it will pass through the culvert under the freeway in order to reach the minable material in the southeast corner of the property. Mr. Sando estimated that "it will cost about $5000 to make the necessary changes in the conveyer system," and he included this amount in his computation of severance damages.

Plaintiff's valuation witness, Mr. White, testified that he would allow no damage for dismantling and reinstalling the conveyer system in that area. He explained that defendant

would not be damaged by the removal of the conveyer because defendant would lease the southeast corner to the owner of the adjacent property, Owl Rock Products Co., at a rental higher than the market.

Other evidence, already in the record, showed that Owl was engaged in mining the adjacent property. On January 20, 1964, which was before the valuation date, defendant and Owl had entered into a "mutual excavation agreement" whereby Owl was granted the privilege, but not the obligation, to excavate the strip 10 feet wide along the west side of the common boundary, at a royalty rate of $.25 per ton. After the commencement of this proceeding, but prior to trial, Owl made a written offer to defendant to mine all of defendant's property east of the freeway for $.25 a ton. Defendant rejected this offer, but made a counteroffer to lease a portion of that property to Owl, which Owl accepted on July 26, 1965. This evidence came in as a part of defendant's case to support Mr. Sando's opinion that $.25 per ton was a fair rent.

Defendant now complains that the trial court committed reversible error in refusing to give the jury the following instruction, which defendant had requested:

"In the construction of the freeway improvement, the State, plaintiff herein, has agreed to construct and install, at its own expense, an 8′ x 8′ box culvert for the specific purpose of enabling the defendant to continue to operate its conveyor system from pit to plant site as formerly. In this regard, you are instructed that as part of this construction for the specific purpose stated, namely, for a continuation of the conveyor system as nearly as practicable as under former conditions, the State, plaintiff herein, has the obligation as a matter of law to so far as possible mitigate damages to this defendant and that includes the right of defendant to compensation for the dismantling and reassembling of said conveyor system through said box culvert. Accordingly, since the uncontroverted evidence is that the cost of such dismantling and reassembling is the sume [*sic*] of $5,000, you are to include such sum in your award for damages."

The proposed instruction is defective in several respects.

The first sentence asserts that plaintiff had a "specific purpose" which plaintiff does not concede. The box culvert is unquestionably installed for the purpose of providing access, but whether defendant will install its conveyer system there is another matter.

The second sentence erroneously refers to an "obligation" to mitigate damages. ■ The only obligation which need concern the jury in this connection is the duty of the plaintiff to pay severance damages, i.e., the amount by which the market value of the remaining property is diminished by its severance from the part taken. The cost of the restoration of improvements (such as the conveyer system) which have been dismantled in the taking may be relevant on the issue of severance damage. If the cost of such restoration ("cost to cure") is less than the diminution in market value which would result from the permanent removal of the improvement, then the former, rather than the latter, will be the measure of the damage. But cost to cure is a measure of damage only when it is no greater in amount than the decrease in the market value of the property if left as it stood. (See *People* v. *Hayward Bldg. Materials Co.*, 213 Cal.App.2d 457, 465-466 [28 Cal.Rptr. 782].)

■ In the case at bench Mr. White was of the opinion that the market value of the severed parcel would not suffer from the loss of the conveyer because the rock and gravel there would be sold advantageously to Owl. Defendant's rejoinder—that it has no "duty" to deal with its competitor —misses the point. The Owl transaction simply illustrates the fact that there is more than one way to make a profit on the southeast corner of defendant's land. The issue for the jury to decide was whether the taking reduced the value of plaintiff's remaining property and, if so, in what amount. (See *Los Angeles County Flood etc. Dist.* v. *McNulty*, 59 Cal.2d 333, 338 [29 Cal.Rptr. 13, 379 P.2d 493].)

The final sentence of the proposed instruction takes from the jury its power to decide those factual issues. The $5,000 figure used by Mr. Sando was not an appraisal of anything. It was purely his estimate of the approximate cost of restoring the conveyer system to the far side of the freeway, where he thought it should go. No supporting data was offered. The weight to be given to this kind of estimate, even though uncontradicted, is for the jury to decide. If the jury was of the opinion that the cost of replacing the conveyer was an element of severance damages, it was not bound by Mr. Sando's estimate of the cost. (See *Linforth* v. *San Francisco Gas & Elec. Co.*, 156 Cal. 58, 63 [103 P. 320, 19 Ann.Cas. 1230] ; Witkin, Cal. Evidence (2d ed. 1966) § 431.)

The trial court instructed the jury regarding severance damages in general terms, giving BAJI No. 506 (Mod.) and

506A. A further instruction pointing up the issue with respect to the conveyer system might have been given, but the one which defendant offered was rightly refused.

 Defendant's final contention is that the testimony of Mr. White should have been stricken on various grounds which were elaborated in the trial court and in the brief on appeal. In essence, this is no more than an attack upon the weight and credibility of the testimony, matters which are peculiarly for the jury's consideration. No further discussion is called for here.

The judgment is reversed with directions to retry the issues as to the fair market value of Parcel 3A (Reamended) and the severance damages which will accrue to the remainder of the property not condemned, by reason of the taking of Parcels 3A (Reamended), 3B, 3C (Amended), 3D, and 5 (Amended).

Jefferson, J., and Kingsley, J., concurred.

A petition for a rehearing was denied August 5, 1968, and respondent's petition for a hearing by the Supreme Court was denied September 11, 1968.