[No. F006239. Fifth Dist. July 27, 1987.]

THE PEOPLE ex rel. DEPARTMENT OF WATER RESOURCES, Plaintiff and Appellant, v.
NORMAN P. ANDRESEN et al., Defendants and Respondents.

[Opinion certified for partial publication.†]

---

SUMMARY

---

† Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of part III.

COUNSEL

John K. Van de Kamp, Attorney General, Marvin Goldsmith, Assistant Attorney General, Seward L. Andrews and James H. Wernicke, Deputy Attorneys General, for Plaintiff and Appellant.

Justin M. McCarthy, Warren J. Abbott, Jarlath Oley and Albert Thomas Henley as Amici Curiae on behalf of Plaintiff and Appellant.

Robert H. Ames, Pioda, Bryan, Ames, Helfrich & Wills, William J. Turner and Turner & Mulcare for Defendants and Respondents.

OPINION

BALLANTYNE, J.—

## INTRODUCTION

The State of California appeals from a jury verdict awarding $3.2 million to the defendants in a condemnation action. The defendants received an additional $1.5 million in prejudgment interest and were awarded $1.2 million in attorney fees.

Acting through the Department of Water Resources, the State of California brought the condemnation action on December 4, 1981, to acquire 689 acres adjacent to the San Luis Reservoir. A rockslide on the San Luis Dam

caused serious damage which required immediate attention before water could be stored in significant quantities again. In addition, the O'Neill Forebay Dam was in need of repair.

The condemned property is 689 acres which contains a 134-acre basalt rock quarry used in the original construction of the dams. The state used rock in the quarry to repair the damage to both dams.

The only issue at trial was the value of the condemned property. The defendant landowners maintained that the highest and best use of the subject property was as a rock quarry. Because the rock quarry had been dormant since construction of the new dams, the state contended that valuation of the property as a quarry business was speculative and that the property only had value as grazing land.

## FACTS

In 1974, Dr. Andresen bought 2,360 acres from the Domengine Estate. Four Catholic charities, beneficiaries of the Domengine Estate, retained a 50 percent interest in mineral rights. Dr. Andresen used the acreage for cattle grazing.

The basalt rock quarry was used in the construction of the dams until they were completed in 1967. The state mined 10.7 million cubic yards of granite from the quarry in the original construction of the dams. The average cubic yard of granite weighs 2.25 tons. Although the state originally brought a condemnation action during the construction of the dams, the suit was abandoned in 1969. Between 1967 and 1981 there was very limited quarry activity on the property.

In mid-September of 1981, a major rockslide damaged the San Luis Dam. The incident was highly publicized. Because it was an earth-filled structure, the dam had to be repaired quickly. Dr. Andresen was notified by letter dated September 22, 1981, that the state wanted to appraise the property. He consented to the appraisal. The doctor was not sure that the property was going to be condemned until November 19, 1981. On that date the state sent notice of a hearing to adopt a resolution of necessity to acquire the property by condemnation. The condemnation action was filed December 4, 1981.

John Sales, an employee of Basalt Rock Company in Napa for 30 years and managing four quarries, testified that the defendants' quarry was reasonably accessible to public roads and suitable for basalt rock production. Sales felt that the quarry could be operated as a viable business. He was

personally familiar with the local market for basalt rock in the Monterey Bay area, the lower delta and portions of the San Joaquin Valley. Large amounts of basalt rock were already being shipped from greater distances away than the defendants' quarry site to these regions. Sales concluded that there was a market for at least 60,000 tons of basalt rock a year at a rental-royalty value of $1 per ton.

The quarry contained 60,000 tons of very high quality derrick rock that had already been mined and was ready for immediate use. Approximately 1.89 million tons of granite was excavated and used in the repair of the two dams. Bennie Troxel, a geologist called by the defendants, testified that the quarry still contained 100 to 150 million tons of usable granite after the repairs were completed. He further stated that it was economically feasible to mine granite to a depth of 300 feet below the surface of the hill. Irwin Winterhalder, an engineering geologist called by the state, corroborated these facts stating that after repairs the quarry contained 48 million cubic yards of granite, or 108 million tons. Winterhalder also conceded that the highest and best use of a property is that use which generates the greatest economic return whether or not the property is being used for that purpose at the time.

The parties never disputed the value of the property as grazing land. The state's experts, however, valued the rock quarry as mere pasture land. The defendants called three experts to place a value on the 134-acre quarry. Two were licensed real estate appraisers and one was a licensed mining engineer and appraiser. Overruling the objections of the deputy attorney general, the trial court permitted each of the defendants' experts to valuate the quarry as if it were a business.

The two real estate appraisers, Floyd Clevenger and Robert Erich, testified that it was not unreasonable for the defendants to anticipate repairs to both dams over the course of time. They agreed that the highest and best use of the property was as a rock quarry. Each looked to the total granite tonnage used in the project itself and then capitalized the value of repairs to both dams over time. Neither appraiser directly enhanced the value of the property due to the disaster itself. Both, however, placed a dollar value upon the rock actually used in the repair project and in this way indirectly measured the enhancement value of the repair project.

Clevenger and Erich then looked to the overall market for basalt granite and made comparisons to other quarries to fix an average market price for a ton of rock. The typical quarry owner would lease out the quarry and receive an average of $1 per ton royalty for mined rock. To begin a rock quarry business, the defendants would only have to build a larger road

leading into the site which would cost approximately $94,000. There was a viable market for the sale of 60,000 to 90,000 tons of granite per year at a rental-royalty value of $1 per ton.

Clevenger and Erich each determined that the value of the mined granite actually used in the project was just under $1 million. The capitalized value of an ongoing business producing 90,000 tons of granite per year, after the expense of building a road and adding in the 555 acres of pasture land, was $2,058,300 by Clevenger's calculations and $2,167,000 by Erich's calculations. These figures included the 60,000 tons of high quality derrick rock that had already been mined and was on the site.

The defendants then called Douglas Ketron, a licensed mining engineer and appraiser. He testified that the quarry's stone was ideal and that the highest and best use of the 134-acre parcel was as a basalt rock quarry. Ketron stated that if the state had written out a check for the value of the stone actually used in the project, it would have been for $2.225 million. In calculating the value of the quarry, however, he estimated the current demand for granite in the local area at a rental-royalty value of $1 per ton. Ketron then conservatively increased production to a fixed point, discounted annual values, and calculated a 30-year life span for a quarry business. Using this method he stated that the quarry had an economic value of $3.25 million.

The trial court denied the state's motion to introduce Dr. Andresen's purchase price of the property in 1974. The court found that the date the defendants could reasonably foresee the property was being condemned was November 19, 1981. The court further found that enhancement value of the project due to the repair itself ended on November 19, 1981, and the date chosen to establish the value of the property was December 4, 1981. The trial court instructed the jury that it could measure the enhanced value of the property due to the repair project but could not determine the value of the property to the state for the purpose for which it was being acquired.

Prior to trial the defendants filed a joint demand for $1,050,000, plus the $229,000 the defendants had previously withdrawn from the state treasury, to settle the action. The state's final offer to settle the action, including prejudgment interest, was $300,000.

On appeal the state argues that the court impermissibly allowed defendants to present evidence of the beneficial use to the state for which the property was being condemned. The state argues that the defendants improperly capitalized future royalty income from a potential quarry business, not a business in actual operation. The state further maintains that it was

prejudiced because it was not allowed to present evidence of Dr. Andresen's purchase price of the property in 1974. The state finally contends that the trial court improperly determined that the state's final offer of compensation was unreasonable and awarded excessive attorney fees.

Amicus curiae further argues that because Dr. Andresen anticipated that his property would be used in the project, he necessarily knew the value of his property would be enhanced. Under this rule prohibiting enhancement value for known specific uses, amicus curiae contends defendants are barred from damages for the use of the property in the project. Counsel urges this court to precisely define the term "project" to avoid future confusion over what forms of enhancement value are proper damages.

### DISCUSSION

### I.

### PROPERTY VALUATION.

The state appeals because it claims that the defendants improperly valued the property according to the use for which it was being acquired by the state. The state has maintained throughout the course of litigation that the highest and best use of the property was as grazing land because the defendants did not have an existing rock quarry business at the time of condemnation.

According to the state, defendants are not entitled to the enhanced value of the property as a quarry because it had only been used commercially as pasture land. The state argues that defendants' experts were improperly looking to the state's ultimate use of the the property by evaluating the commercial potential of the disputed 134 acres as a rock quarry business.

#### A. *Enhanced Value.*

*Merced Irrigation Dist.* v. *Woolstenhulme* (1971) 4 Cal.3d 478 [93 Cal.Rptr. 833, 483 P.2d 1] stands as the clearest and most complete statement of what kind of enhancement value is compensable. Property in the vicinity of a proposed development may immediately rise in value the moment the project is announced. If the project is an improvement, adjoining properties all benefit and generally increase in value.

*Woolstenhulme* holds that such general enhancement value is compensable as long as particular property is not singled out for taking. As soon as a specific property is designated for taking, the owner may not continue to

speculate in the marketplace to force the condemner to pay an inflated value for the property. In measuring the value of the property, the property owner may not anticipate the economic value of the property to the condemner. (4 Cal.3d at pp. 487-491.)

Based on article I, section 14, of the California Constitution,[1] a unanimous *Woolstenhulme* court formulated the following rule: "[U]nder our just compensation clause, an owner of the condemned property should be compensated for the increase in value which his land has experienced in anticipation of the benefits of a proposed improvement, so long as it is not reasonably probable that the specific piece of property being evaluated is to be taken for the improvement." (4 Cal.3d at p. 487.)

*Woolstenhulme* identified three categories of project enhancement. The first is property that is known to be in a project that rises in value due to the project. The second is property expected to be condemned that rises in value due to anticipation that the condemner will have to pay an inflated price for the land. The third is property expected to be outside a proposed improvement that rises in value because of proximity to the proposed improvement. (4 Cal.3d at p. 490.) Only project enhancement in the third category is compensable. The property owner may be compensated for the enhancement value of the project as long as the expectation is for the property itself not to be taken. (4 Cal.3d at p. 492.)

For two days the trial court heard *in limine* motions by the state to exclude project enhancement value. The court took testimony from Dr. Andresen and witnesses for the state. The trial court found that although Dr. Andresen expected that rock would be used from his quarry for the project, he did not foresee condemnation until November 19, 1981. This was nearly two and one-half months after the rockslide on the dam.

The trial court interpreted *Woolstenhulme* to require the owner to anticipate an actual *taking* of the property as contrasted from a temporary use of the property. The state and amicus curiae argue on appeal that the defendant's expectation that rock would be used from his quarry is identical to knowing a taking will or probably will occur.

A studied reading of the *Woolstenhulme* decision reveals that the owner, as a reasonably informed individual, must be able to foresee that his or her property is being taken before the property falls within the prohibited project enhancement of categories one and two. (See 4 Cal.3d at pp. 487, 497.) The word "taken" as used in *Woolstenhulme* is only applied within

---

[1] Article I, section 14, was reenacted as article I, section 19, on November 5, 1974.

the context of condemnation. The *Woolstenhulme* court never refers to mere use of property in discussing the three types of project enhancement.

The state and amicus curiae would have this court restrict *Woolstenhulme* exception number three to all projected uses of the property, whether or not the property is actually taken. Thus, for cases in which the property is temporarily used or only a portion of the minerals on the property are actually extracted, the owner would not be entitled to project enhancement value from the time the owner learned of the proposed use of the property.

Dr. Andresen's expectation that the state would use granite from his property is not tantamount to an expectation that his property will be taken by condemnation. Given the past history of the project, his reasonable expectation would be that the state would pay him for use of the granite as it had done with the previous owner when a far greater quantity of rock was used to construct the two dams. The property here was not temporarily used. It was actually taken by condemnation.

Three of the defendants' primary experts distinctly stated that they valued the property using capitalization of a potential rock quarry business. Floyd Clevenger expressly stated that he did not look to the project enhancement value in his calculations. Testimony surrounding calculations of the property value were based instead upon conservatively estimated royalties for basalt in that local market, not on project enhancement. Nevertheless, each expert still placed a dollar value on the 1.89 million tons of rock actually used in the project, using charts displaying this information in addition to their testimony.

There was substantial evidence to support the trial court's conclusion that the defendants did not have a reasonable expectation that the property would be condemned until November 19, 1981. The trial court correctly observed that the very fact the quarry was located so close to the dam enhanced its value before the rockslide in September of 1981.

Looking specifically to the three *Woolstenhulme* categories of project enhancement, the state and amicus curiae contend that Dr. Andresen's property was category one or two property. The property was either known to be in the project or the defendants' only reasonable expectation was that the property would be used in the project.

The first category does not characterize the condemnation of defendants' property. Defendants' quarry was not part of the project in the manner of property on which something is built or of property to be used for a particu-

lar purpose. The quarry, for instance, was not the only source of rock for the project. It was merely the most convenient source of rock for the project. Dr. Andresen knew the repair project was inevitable, but no one was certain that the property would be condemned for use in the project. In the past, the much larger mining of rock for the construction of the dam did not result in condemnation. The trial court's finding of fact that the defendants were not certain their property would be condemned until November 1981 is supported by substanial evidence and will not be overturned on appeal. (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 278, pp. 289-291.)

The key to understanding the second category is the expectation that property will be condemned in the future. As shown above, the defendants' reasonable expectation that the quarry would be mined to repair the dams is not tantamount to an expectation of condemnation. The past history of the original dam construction suggests precisely the opposite.

The third category is property outside a proposed improvement that rises in value because of its proximity to the project. The defendants' quarry was not part of the dam or its adjoining facilities. It was "outside" the improvement. The improvement was the repair of the damaged portion of the dams. The quarry was also very close to the site of the repair. The value of all quarry sites within a given circle around the dams were, in all probability, also increased. Because the defendants did not have an expectation of condemnation for the first two and one-half months after the original rockslide, they were entitled to reasonable enhancement value from the project itself.

B. *Value of the Property to the Condemner.*

■ The state and amicus curiae argue that the defendants' experts improperly looked to the use for which the property was being acquired to affix a value to the property. ■ *Woolstenhulme* clearly states that the value to the condemner cannot be used to calculate the value of the property to the property owner. This is the type of real estate speculation that is rejected as an element of damages in condemnation actions, and it is expressly described as the prohibited enhancement value in category one of the *Woolstenhulme* decision. Simply stated, purchasers of property that is known to be condemned are prevented from inflating the value of the property by conjecturing what the condemner will actually pay for the property. (4 Cal.3d at pp. 490-491.)

The type of speculation that *Woolstenhulme* specifically seeks to prevent in prohibited enhancement categories one and two is speculation occurring through multiple sales of property after specific property is known to be

condemned for a project or will probably be condemned for a project. An original property owner will often sell property to a speculator who hopes to sell the property at an inflated price to yet another speculator or to the condemner.

■ There was no such speculation by the defendants here as to the sale of the property. The defendants did not try to find other purchasers for the property.

The defendants attempted to enter into a contract for the sale of rock for the repair project with a potential project contractor. The contract itself, however, was to rent the right to mine rock at the fair market value of $1 per ton. This is not what one traditionally refers to when one uses the term speculation. Had the defendants attempted to contract with the potential project contractor at a royalty for the rock significantly above its fair market value, this type of speculation would violate the spirit of the rationale underlying *Woolstenhulme*. This did not occur here.

The state and amicus curiae have argued at length that the defendants' experts valued the 1.89 million tons of rock used in the repair of the dams and in that way they have improperly viewed the value of the property to the state. According to the state and amicus curiae, the exact amount of granite used in the repair was calculated into the defendants' property value. They argue that this was an improper consideration of the use of the quarry by the condemner. Under *Woolstenhulme,* however, any informed buyer can legitimately evaluate the proximity of the quarry to the repair project before it becomes apparent the property will be condemned.

The defendants' experts indicated that future granite repairs to the dams were very predictable to informed buyers. The likelihood the quarry would be used in future repairs was high. The greater the propinquity of a quarry to the dam, the greater the probability it would be used in repairs. Thus, any error in looking directly to the amount of granite used in the repair project is mollified by the high probability that the quarry would be used in future repairs of equivalent scale, an enhancement factor that existed before the rockslide.

The state acquired the entire quarry in fee simple. The value to the state of the 134-acre rock quarry was not the 1.89 million tons of basalt used to repair the two dams. The state obtained far more than 1.89 million tons of rock. It acquired a quarry containing at least 100 million tons of high quality basalt rock that could be economically mined for an almost indefinite period of time if the sole use is for repair of the San Luis Dam.

The state's own witness, Irwin Winterhalder, an engineering geologist, testified that the quarry contained 48 million cubic yards, or over 108 million tons of basalt. Only 10.7 million cubic yards of basalt from the quarry had been used to initially construct the dams.

No expert attempted to place an ultimate value to either party of the 100 million tons of basalt still remaining in the quarry. The defendants attempted to place a value on the quarry as a business, but did not place a value on the entire basalt deposit. The defendants' evaluation methods will be discussed in greater detail below.

An ultimate valuation of the quarry to the state was never made by either party. There was testimony that the defendants could reasonably expect to provide basalt for future repairs to the dams. The value to the state of having a permanent source of high quality basalt cannot be determined by looking artificially to a single repair operation in 1982. The value of the quarry to the state does not end at the conclusion of one repair operation. The value to the state in owning this quarry lies in its use for future repairs and even its potential as an inexpensive source of basalt to other public works projects in the vicinity of the quarry.

To the extent that it was error for the defendants' experts to testify as to the value of the rock used in the 1982 repair project, the error is harmless. The value of the rock used in the project as set by the defendants' experts was less than the $3.2 million judgment. The state acquired far more than 1.89 million tons of rock when it acquired the property in fee simple. The jury was instructed not to look to the value of the property to the state. The state obtained a major rock quarry, the ultimate value of which was never determined at trial.

To the extent project enhancement value was calculated by any defense expert and considered by the jury, it was a proper subject of evaluation under *Woolstenhulme* because the defendants did not anticipate condemnation until November 19, 1981, and the trial court specifically ended all project enhancement valuation as of that date.

The defendants did not know their property would be condemned. Knowledge of probable mining for use in repair is not knowledge of future condemnation. The *Woolstenhulme* bar to enhancement damages for known future uses does not apply unless there is specfic knowledge that the property will be, or probably will be, condemned. The only reasonable interpretation of the word "use" within the context of the *Woolstenhulme* decision is that it refers to the use of property by the condemner after the condemner has taken the property. In the context of the *Woolstenhulme* decision,

therefore, the term "use" is synonymous with an actual condemnation of the property, not a temporary utilization of the property for particular purposes.

There is no merit to the contention of amicus curiae that the defendants were being compensated for past projects and for future projects as well as for the repair project. The compensation was for the condemnation of the property as a rock quarry. The actual use of material from the quarry was considered part of its general enhancement value. Amicus curiae confuses the use of rock and the repair of the dams with the actual value of the rock quarry to the condemner.

The value of the quarry to the condemner far surpassed the value of the quarry for one repair project. We decline the amicus curiae invitation to precisely define the term "project" as it is used in all condemnation actions. It is sufficient under these facts to point out that neither party considered the project or the condemnation to include damages for past construction of the dams. Neither party placed an ultimate dollar value on the remaining reserve of unmined granite. In this case, the use of rock in the repair project was far more limited than the ultimate value of the condemned property.

We conclude that the defendants' enhancement valuation was not predicated upon the condemner's future use of the property even though the defendants' experts did place dollar values on the rock used in the repair project. The value of the rock quarry to the condemner far surpassed the value of the 1.89 million tons of rock used to repair the dams.

C. *Highest and Best Use.*

The state argues that the highest and best use of the entire 689 acres was as cattle grazing land because the defendants did not have an existing rock quarry business. The defendants' experts testified that the highest and best use of the 134-acre quarry was as a basalt rock quarry, not as pasture land.

The state's contemplated use of the 134-acre parcel as a quarry may not be used to determine the highest and best use of the property. Where there is a present need for property not currently being used for that particular purpose, however, a condemnee may tender evidence that the property is suitable for such a purpose. *City of Los Angeles* v. *Decker* (1977) 18 Cal.3d 860 [135 Cal.Rptr. 647, 558 P.2d 545] held that where the condemner determines that property is suitable for a particular need, such evidence may be introduced to buttress the condemnee's contention that the highest and best use of the property is for that particular need. This is true even if

the property has not yet been developed to that particular highest and best use. (18 Cal.3d at pp. 869-870.)

 The property in dispute here was a preexisting rock quarry. It had been used in the initial construction of the dams. Rock from the quarry had been used later to repair the dams. The defendants' experts each testified that the highest and best use of the 134 acres was as a rock quarry. Photographs of the property taken at the time of the rockslide, immediately before condemnation, were introduced into evidence at trial. They unequivocally showed that the disputed parcel was already a fully developed benched rock quarry. It was no longer viable for use as pasture land. Already mined and stored on the parcel were 60,000 tons of rock ready for immediate use. Small amounts of rock had been sold or taken from the property between the time that the state abandoned the original condemnation action in 1969 and the 1981 condemnation action.

The *Decker* court found that it was proper to admit testimony into evidence that commercially undeveloped residential property could be used in the future as airport parking even though it had not been developed for that particular purpose. Here, the quarry was in existence as a quarry before the rockslide occurred and before the state began its condemnation action.

The state's contention that the property's highest and best use was as pasture land is unreasonable under the present facts. The 134-acre parcel was unusable as grazing land from the time it was used to build the dam. Even Irwin Winterhalder, the state's engineering geologist, conceded that the highest and best use for property is that use which generates the greatest economic return to the owner. He admitted on cross-examination that this was true even where the property was not currently being used for its highest and best purpose.

The state had its opportunity to prove that the highest and best use of the property was as grazing land and it failed. This issue is an evidentiary issue which this court will not alter on appeal since there was substantial evidence before the jury that the highest and best use of the 134-acre parcel was as a rock quarry.

## II.

### CAPITALIZING FUTURE ROYALTIES.

 The state and amicus curiae, State Water Contractors, Inc., contend that the defendants' valuation of the rock quarry using a capitalization for future royalties was too speculative to be valid. The state maintains that

evaluating leaseholds under Evidence Code section 817 is proper only where the leasehold in fact exists. Since there was no leasehold for the sale of rock here, the hypothetical rental of the quarry for a given royalty was pure fabrication.

Amicus curiae maintains that the trial court found that there was only one project from the time the quarry was first used to build the dam to an indefinite future time and the defendants received the past and future value of the rock quarry when in fact they were entitled to the value of one single repair project. The effect of allowing the defendants' experts to testify as to the capitalized value of the land was to permit damages for prior use of the quarry, which were already compensated, and to permit damages for future projects involving the quarry, which are speculative. Amicus curiae argued that there were multiple projects at San Luis Reservoir involving the quarry and that the defendants can only be compensated for one of those projects.

In *City of Los Angeles* v. *Retlaw Enterprises, Inc.* (1976) 16 Cal.3d 473 [128 Cal.Rptr. 436, 546 P.2d 1380], the defendant had purchased property adjacent to the Palmdale Airport. Its expert testified that the property had a highest and best use as industrial property without specifying particular industrial uses. The Supreme Court affirmed this form of opinion evidence stating that an expert should attempt to "ascertain the general use to which the property can profitably be put." The court made clear that Retlaw's expert did not attempt to capitalize the earnings of a hypothetical business. (16 Cal.3d at p. 489.)

The hypothetical business rule discussed in *Retlaw* follows a line of authority beginning with *Sacramento etc. R.R. Co.* v. *Heilbron* (1909) 156 Cal. 408 [104 P. 979] that holds valuation of property based on hypothetical businesses to be too speculative to determine a realistic fair market value for the property on which the potential business is located. The prohibition against capitalization earnings for hypothetical businesses is a practical rule applied where property has many possible uses. Where property has several potential uses, condemnees could pick and choose the most profitable hypothetical use for their property and evaluate the property at inflated rates.

*Retlaw,* however, recognized that the ultimate property owner would have reasonable access to the airport. Thus, the property had a more specialized industrial use. The court stated that contingent or potential uses were to be evaluated using a reasonably probable standard: "The city maintains that our decision in *People* v. *Dunn* (1956) 46 Cal.2d 639, 642 . . . establishes that a contingency must be 'reasonably probable' in order to properly enter the valuation process. *Dunn* dealt with potential changes in the zoning laws. Since we conclude that the reasonable probability standard

is satisfied in this case, we need not determine if a less exacting standard should apply to potential contractual agreements." (16 Cal.3d at p. 489, fn. 13.)

The California Supreme Court leaves open the possibility of applying a lesser standard of review of potential contracts than the reasonably probable standard announced in the *Dunn* decision. (*People* v. *Dunn* (1956) 46 Cal.2d 639 [297 P.2d 964].) The *Retlaw* court recognized that businesses with potential contracts may be entitled to some sort of compensation. The court further recognized that a lesser standard than the reasonably probable standard may be used in determining the vitality of such contracts, but refused to reach the issue under the facts of that particular case. The *Retlaw* court, however, did recognize that property adaptable to a very specialized use (there, industrial use with access to an airport) may be enhanced in value due to that specialized use, and that specialized use is an element of damages in eminent domain cases.

This court need not change the standard of review from the reasonably probable standard announced in the *Dunn* and *Retlaw* decisions to measure the value of the property based on potential contracts. Applying the reasonably probable standard of review to potential contracts in a potential basalt quarry business, experts can reasonably calculate the probability of the size of the market for such a quarry business, as well as its value, without being overly speculative. For the following reasons, the prohibition against measuring the hypothetical potential of businesses as set forth in *Retlaw* and *Heilbron* need not be violated because the instant action is a very distinguishable type of action from those cases.

The defendants' 134-acre quarry is a preexisting rock quarry. It is already developed for a very specific use. Its highest use is as a rock quarry. Unlike the property described in *Retlaw,* the rock quarry does not have an infinite range of potential uses. The defendants did not exercise the opportunity, for instance, to evaluate the property as a gold mine or an oil field. The property has only one practical use and that use is also the property's highest and best use.

The only way to measure the value of the rock quarry was for the defendants' experts to look to the rental value of the property as a rock quarry. Evidence of profits derived from a business conducted on a piece of land is considered too remote and uncertain to be used as a basis for determining market value. (*People* v. *Dunn, supra,* 46 Cal.2d 639, 641; *City of Pleasant Hill* v. *First Baptist Church* (1969) 1 Cal.App.3d 384, 399 [82 Cal.Rptr. 1]; *South Bay Irr. Dist.* v. *California-American Water Co.* (1976) 61 Cal.App.3d 944, 986 [133 Cal.Rptr. 166].) Evidence of value based upon

an owner's projected plan or speculative scheme for the condemned property is also inadmissible. (*City of Los Angeles* v. *Retlaw Enterprises, Inc., supra,* 16 Cal.App.3d 473, 488.)

Rental value, on the other hand, is a proper basis for determining the value of property in condemnation cases. (*People* v. *Dunn, supra,* 46 Cal.2d 639, 641-642.) Whether or not the continuity of income from the sporadic use of a property is too speculative to apply a capitalization of income approach goes more to the weight of an expert's opinions concerning market value than to the admissibility of such an opinion. (*South Bay Irr. Dist.* v. *California-American Water Co., supra,* 61 Cal.App.3d 944, 985.)

Usually the rental value of the property is measured in terms of existing tenancies. Tenants, like owners in fee, are also entitled to compensation in condemnation. (*S.F. Bay Area Rapid Transit Dist.* v. *McKeegan* (1968) 265 Cal.App.2d 263, 271 [71 Cal.Rptr. 204]; *People* ex rel. *Dept. of Public Works* v. *Amsden Corp.* (1973) 33 Cal.App.3d 83, 87-89 [109 Cal.Rptr. 1].) California courts follow what is known as the appraisal trinity. An excellent summation of the appraisal methodology and the appraisal trinity approach, as it is set forth in the Evidence Code, is made in *Redevelopment Agency* v. *First Christian Church* (1983) 140 Cal.App.3d 690, at page 705: "In condemnation actions, California courts have long recognized what has been referred to as the 'appraisal trinity.' (*State of Cal.* ex rel. *State Pub. Wks. Bd.* v. *Stevenson* (1970) 5 Cal.App.3d 60, 63 . . . .) This term encompasses three methods or approaches used by appraisers to determine the fair market value of real estate: (1) the current cost of reproducing (or replacing) the property less depreciation from all sources; (2) the 'market data' value as indicated by recent sale of comparable properties; and (3) the 'income approach,' or the value of which the property's net earning power will support based upon the capitalization of net income. (*Stevenson, supra,* at p. 63; *State of Cal.* ex rel. *State Pub. Wks. Bd.* v. *Covich* (1968) 260 Cal.App.2d 663, 665-666 . . . .) In 1965, the state Legislature codified these three approaches in Evidence Code sections 815-820. A qualified appraiser in an eminent domain proceeding may use one or more of these valuation techniques to ascertain the fair market value of the condemned property. (*Stevenson, supra,* 5 Cal.App.3d at p. 63.)

"As we earlier observed, underlying the entire valuation process is the concept of 'just compensation.' The principle sought to be achieved by this concept 'is to reimburse the owner for the property interest taken and to place the owner in as good a position pecuniarily as if the property had not been taken.' (*People* ex rel. *Dept. of Transportation* v. *Southern Pacific Transportation Co.* (1978) 84 Cal.App.3d 315, 324 . . . .) Accordingly, neither the Legislature nor the courts of this state have singled out any one

appraisal technique as an exclusive method of valuation. (*Napa Union High School Dist.* v. *Lewis* (1958) 158 Cal.App.2d 69, 73 . . . .) In most instances, the nature of the property condemned will determine which of the three approaches provides the best estimate of fair market value. Naturally, the condemnee will seek to employ that method which establishes the highest approximation of value and the condemner, the lowest. The jury, after hearing evidence from both parties and being instructed on the law by the court, must sift through the morass of conflicting testimony and determine the level of just compensation." (140 Cal.App.3d at p. 705.)

The defendants' experts testified that the common method of developing a rock quarry was for the owner to lease or to rent the property out to a quarry operator who in turn pays a royalty for the mining of the rock. The experts then testified that there was a certain market for a minimum of 60,000 to 90,000 tons of rock per year in the location of the defendants' quarry. The minimum royalty for a ton of quarried rock was $1 per ton. Trial courts are vested with wide latitude in determining whether experts' opinions are too speculative. (*Id.* at p. 703.)

Although the state objected to the introduction of this line of testimony, its tactic at trial was to hold to the theory that the rock quarry was undeveloped pasture land. It did not directly attack the viability of local markets for quarried rock or the royalty values of the granite.

Two reported cases actually allow property rental recovery for ventures that were not yet in operation during condemnation proceedings. Appraisers were allowed to capitalize the rental income of hotel rooms in *Redevelopment Agency* v. *Del-Camp Investments, Inc.* (1974) 38 Cal.App.3d 836, 841-842 [113 Cal.Rptr. 762], even though the hotel was rented out to a single individual at a lesser rent than the rooms could bring on the open market. In *People* ex rel. *Dept. Pub. Wks.* v. *Flintkote Co.* (1968) 264 Cal.App.2d 97, 102 [70 Cal.Rptr. 27], evidence as to the economic feasibility of a hypothetical underwater mining operation for an existing sand and gravel quarry was found to be relevant to valuation of the property.

Where property has only one specific use, as in *Del-Camp Investments* and *Flintkote,* the better reasoned rule is to permit evidence of value based on that use or related uses even if it is to some degree hypothetical. Defendants' valuation methods here are well within accepted procedure under California's trinity approach. The issue presented here is not admissibility of evidence but what weight to give the defendants' valuation testimony.

The defendants' quarry existed when they bought the property. The 134-acre quarry can best be used as a basalt quarry. The defendants' experts

were adamant that their estimation of granite values was based on comparable figures and that there were substantial and consistent markets with a constant demand for quarried rock within the local marketing region of the quarry. The opportunity for unbridled speculation in the defendants' valuation of the property was very remote under these circumstances.

There is also no merit to the state's contention that Evidence Code section 822 bars evidence of the value of basalt royalties.[2] ▮▮ The purpose of Evidence Code section 822 is to prevent introduction into evidence of particular acquisitions of similar properties by the condemner itself. The parties are to focus instead on the market value of the property at the time of condemnation. (*South Bay Irr. Dist.* v. *California-American Water Co., supra,* 61 Cal.App.3d 944, 983-984.) For the reasons discussed above, subdivision (a)(5) does not apply because the evidence as to rental value is admissible evidence. Subdivision (a)(6) does not bar introduction into evidence of capitalized rental values because rental values were capitalized for the defendants' property; not for outside properties.

▮▮ The compensation here was for a taking of property in fee simple. The owners were not compensated based on one giant project beginning with initial construction and ending in futuro as contended by amicus

---

[2] Evidence Code section 822 provides: "(a) In an eminent domain or inverse condemnation proceeding, notwithstanding the provisions of Sections 814 to 821, inclusive, the following matter is inadmissible as evidence and shall not be taken into account as a basis for an opinion as to the value of property:

"(1) The price or other terms and circumstances of an acquisition of property not appropriated to a public use or a property interest not so appropriated if the acquisition was for a public use for which the property could have been taken by eminent domain.

"(2) The price at which an offer or option to purchase or lease the property or property interest being valued or any other property was made, or the price at which such property or interest was optioned, offered, or listed for sale or lease, except that an option, offer, or listing may be introduced by a party as an admission of another party to the proceeding; but nothing in this subdivision permits an admission to be used as direct evidence upon any matter that may be shown only by opinion evidence under Section 813.

"(3) The value of any property or property interest as assessed for taxation purposes or the amount of taxes which may be due on the property, but nothing in this subdivision prohibits the consideration of actual or estimated taxes for the purpose of determining the reasonable net rental value attributable to the property or property interest being valued.

"(4) An opinion as to the value of any property or property interest other than that being valued.

"(5) The influence upon the value of the property or property interest being valued of any noncompensable items of value, damage, or injury.

"(6) The capitalized value of the income or rental from any property or property interest other than that being valued.

"(b) In an action other than an eminent domain or inverse condemnation proceeding, the matters listed in subdivision (a) are not admissible as evidence, and may not be taken into account as a basis for an opinion as to the value of property, except to the extent permitted under the rules of law otherwise applicable."

curiae. They were compensated based on the fair market rental value of the property capitalized over a 30-year period, a method well within the accepted guidelines of the trinity valuation method.

III.*

. . . . . . . . . . . . . . . . . . . . .

IV.

ATTORNEY FEES.

■ Under Code of Civil Procedure section 1250.410, the parties must serve and file final demands relating to compensation at least 30 days prior to trial. If the trial court finds that the condemner's offer was unreasonable and that the defendant owners' demand was reasonable in light of the final verdict, the court may award the defendants' costs and litigation expenses.

Courts must look to more than the percentage difference between monetary offers and the final verdict. (*City of El Monte* v. *Ramirez* (1982) 128 Cal.App.3d 1005 [180 Cal.Rptr. 690].) The reasonableness of final offers and awards creates factual issues which depend upon the good faith, the care, and the accuracy used in determining property values. Reasonableness is a question of fact for the trial court to determine. (*Lake County Sanitation Dist.* v. *Schultz* (1978) 85 Cal.App.3d 658, 668 [149 Cal.Rptr. 717]; *Coachella Valley County Water Dist.* v. *Dreyfuss* (1979) 91 Cal.App.3d 949, 958 [154 Cal.Rptr. 467]; *City of El Monte* v. *Ramirez, supra,* 128 Cal.App.3d 1005, 1012.)

The purpose of section 1250.410 is to protect landowners from being forced into unnecessary litigation over the value of their condemned property. (*Redevelopment Agency* v. *First Christian Church, supra,* 140 Cal.App.3d 690, 706.) In the *First Christian Church* case, the condemner made a final offer of compensation for $1.5 million. The defendant appraised the property at $4.77 million, but reduced its final demand to $3.7 million. The verdict was just over $3 million. The trial court's award of $237,000 in attorney fees was upheld on appeal. (140 Cal.App.3d at pp. 706-707.)

■ Here, the defendants' final offer was just over $1.2 million. The state's final offer was $300,000. The verdict was for $3.2 million. The state argues that it valued the pasture land at a higher amount than the defendants themselves but that a legitimate dispute arose as to the value of the

---

* See footnote, page 1144, *ante.*

134-acre quarry. The state also contends that the contingent fee agreements entered into between defendants and their counsel create a windfall award to the defendants.

The state's final offer was less than one-tenth the final verdict and amounted to one-quarter of the defendants' final demand. The defendants' final demand was one-half to one-third the valuation of the property by their experts. The defendants' final demand was just greater than one-third the final verdict. While there was some legal support for the state's contentions, the clear trend of the law does not support their position. The defendants' final offer was generous in light of the valuation by their experts of an existing quarry.

In *Glendora Community Redevelopment Agency* v. *Demeter* (1984) 155 Cal.App.3d 465, 474 [202 Cal.Rptr. 389], the amount to be awarded as attorney fees was held to lie within the sound discretion of the trial court. Contingency fees amounting to $3,664 per hour were upheld on appeal. (*Id.* at p. 477.)

In a carefully reasoned opinion, the trial court in the instant case, after having reviewed the extensive billing statements by the defendants' counsel, exercised its discretion in awarding the $1.2 million in attorney fees. This is clearly a matter which lies within the discretion of the trial court and will not be overturned on appeal absent a manifest abuse of discretion. The state has failed to show where the trial court abused its discretion in awarding the fees in the instant action. The fee award also included the defendants' extensive costs in obtaining experts and defending a complex condemnation action. Both sets of defendants knowingly and willingly entered into contingency fee agreements with their counsel. There was substantial evidence to support the trial court's award of litigation expenses.

## DECISION

The judgment is affirmed.

Hamlin, Acting P. J., and Martin, J., concurred.

Appellant's petition for review by the Supreme Court was denied October 14, 1987. Panelli, J., did not participate therein.