[No. D014096. Fourth Dist., Div. One. June 23, 1993.]

COUNTY OF SAN DIEGO, Plaintiff and Appellant, v.
RANCHO VISTA DEL MAR, INC., et al., Defendants and Appellants.

1048

## COUNSEL

Lloyd M. Harmon, Jr., County Counsel, Diane Bardsley, Chief Deputy County Counsel, Lewis P. Zollinger, Deputy County Counsel, Matteoni, Saxe & Nanda, Norman E. Matteoni, Peggy M. O'Laughlin, Endeman, Lincoln, Turek & Heater, Ronald L. Endeman, Donald R. Lincoln and David Semelsberger for Plaintiff and Appellant.

Daniel E. Lungren, Attorney General, Marvin Goldsmith, Assistant Attorney General, Robert H. Francis and Marsha S. Miller, Deputy Attorneys General, B.C. Barmann, County Counsel (Kern) and Mark L. Nations as Amici Curiae on behalf of Plaintiff and Appellant.

Thorsnes, Bartolotta, McGuire & Padilla, Michael T. Thorsnes, Vincent J. Bartolotta, Jr., Haskins, Nugent & Newnham, Michael H. Fish, Crosby, Heafey, Roach & May, Gideon Kanner, Hufstedler, Kaus & Ettinger and Otto M. Kaus for Defendants and Appellants.

## OPINION

**KREMER, P. J.**—The primary issue presented by this case is whether a property owner whose land is condemned for a jail may value his property

based on a highest and best use as a private detention facility. We conclude the answer is no and therefore reverse.

FACTS

The property here is a parcel of about 525 acres of primarily vacant, undeveloped property in the Otay Mesa area of San Diego County. About 200 acres had a grade change of less than 25 percent and were considered "usable"; the remaining land had a grade change of over 25 percent. The property was zoned as a holding zone for future residential development requiring minimum lot sizes of two to twenty acres depending on the percentage of slope on the particular lot. Access to the property was on a graded dirt road. The property lacked a sewer connection.

Roque De La Fuente bought the property at a bankruptcy sale as part of a larger parcel of about 3,900 acres bought in 1982 for $13 million.[1] He believed he was purchasing the property for 20 to 30 percent of its true value. At the time he bought the property, the State of California was interested in locating a state prison in the Otay Mesa area. De La Fuente offered to sell the property to the state. The state preferred a site separated from the subject property by a canyon. In 1983, De La Fuente exchanged some of his property for state-owned property located near the Mexican border. Some cash was also involved in the transaction. De La Fuente eventually constructed an industrial business park on the property obtained from the state near the Mexican border. In 1985, a border crossing opened in Otay Mesa.

In April 1985, De La Fuente entered into an agreement with Wackenhut Services, Incorporated (Wackenhut) to submit a proposal to the Immigration and Naturalization Service (INS) for a 200-bed facility to temporarily house illegal immigrants on 20 acres of De La Fuente's property. This property was different from the land condemned in this case. De La Fuente agreed to construct the facility on his property and Wackenhut agreed to manage the facility. The parties agreed to grant each other first right of refusal for five years to participate in any further detention projects located in San Diego or California in which the other was involved. INS rejected the De La Fuente/ Wackenhut proposal because the property did not have sewer facilities and De La Fuente did not anticipate a sewer connection until after the state prison connected to the sewer, which was about a year away.

---

[1]The property was actually purchased by two corporations (Rancho Vista Del Mar, Inc., and Rancho De La Fuente) which are closely held by the De La Fuente family. Roque De La Fuente is the principal of these entities and he testified as the property owner in giving a valuation of the property. We refer to De La Fuente both as an individual and to represent the property owners.

In late 1986, De La Fuente and Wackenhut proposed the same 200-bed detention facility to temporarily house parole violators (a "Return to Custody" or RTC facility) to the California Department of Corrections to be built on De La Fuente's land not involved in this case. After the state approved the initial proposal in early 1987, De La Fuente and Wackenhut submitted a formal proposal. In April 1987, the state wrote Wackenhut that "recent political developments in the area have dictated that we wait until this fall to resume our activities."

During 1987, the County of San Diego (county), state and Wackenhut entered negotiations for a 200-bed RTC facility to be operated on 4 acres of property which the county proposed to take from De La Fuente. There was a proposal the county charge the state $180,000 for a ground lease if a 200-bed facility were built and $280,000 for a ground lease if a 400-bed facility were built. The county also wanted the state and Wackenhut to construct the facility and turn over ownership of the building(s) to the county at the end of 10 years. The state did not accept the county's proposal because financing was not available and because "they wanted to get more for using the same type of land" and had objections to the county retaining the building at the end of 10 years.

During the mid-1980's, the county selected the Otay Mesa area as a possible site for a new detention facility. In 1984 or 1985 De La Fuente approached county officials and sought to sell some of his property to the county for a jail site. By 1986, the county had chosen De La Fuente's property for a future jail. After negotiations to purchase the property from De La Fuente failed, the county board of supervisors passed a resolution of necessity to acquire De La Fuente's property in June 1987. On September 16, 1987, the county filed this proceeding for eminent domain and deposited $6.4 million as probable compensation so it could obtain immediate possession of the property.[2] The county's plan was to build a facility with space for 1,040 inmates in phase one and another 1,040 inmates in phase two. The second phase was not yet funded at the time of trial. The environmental impact report (EIR) for the facility considered a 6,000-bed facility on the site but the county had no plans to build a 6,000-bed facility.

In January 1988, Wackenhut wrote De La Fuente, noting the California Department of Corrections had rejected the proposal and had indicated they

---

[2]Named as defendants were Rancho Vista Del Mar, Inc., Rancho De La Fuente, Inc., Border Business Park, Inc., American International Racing, Inc. and D' & D', corporations all closely held by the De La Fuente family, as well as Home Federal Savings & Loan Association.

might "be willing to support a project involving county owned property." Wackenhut, citing the lack of "opportunity in this Proposal for private land," suggested it was not a project De La Fuente would want to become involved with and asked to be released from its agreement to participate in such a project with De La Fuente. Since the county had taken his land, De La Fuente released Wackenhut from its obligation under the contract.

In March 1990, the city and county issued a memorandum of understanding under which the county would lease a site at the East Otay Mesa Detention Facility for $1 per year to the City of San Diego and the city would sublease the site to a private firm to construct and operate a 200-bed prearraignment detention facility. The memorandum of understanding also provided the facility could be expanded to 400 beds.

In July 1990, De La Fuente sought to conduct additional discovery and to add a witness, Charles Thomas, an expert in private detention facilities, to his expert witness list.

Trial commenced in September 1990.

At trial, De La Fuente testified his property was worth $79,635,925 or $3.45 per square foot based on highest and best use as a 6,000-bed private detention facility. In particular, De La Fuente valued the usable portion of the property at about $6.50 per square foot.

De La Fuente testified there was a demand for detention facilities, noting, for example, that while "INS had had a need for 200 beds—today the need is 1000 beds" and that there was a short supply of sites for detention facilities. He believed he had "a unique site" for a detention facility because it was adjacent to a state prison and therefore there was "another place next door so in case of an emergency they might be able to share certain services." The site also had the necessary infrastructure (partially based on the construction of the nearby prison), contained natural barriers (mountains, a canyon), was close to the metropolitan area, was compatible with other uses on the remainder of De La Fuente's property (i.e., off-road vehicle park, race track), would face no opposition from nearby residents since the nearest residence was two miles distant, faced no political opposition and was permitted under the current zoning with a major use permit.

De La Fuente testified about sales of surrounding property in the area around the time of valuation which ranged in size from six to two hundred forty-five acres. These properties which were primarily vacant, industrial or future industrial land, sold at prices ranging from $1.06 per square foot to

$2.06 per square foot. De La Fuente also testified about the sale of a 65-acre property which involved improvements. The parties in that transaction allocated $5 per square foot to the land costs. De La Fuente believed a property which sold for $2.06 per square foot and a 245-acre property which sold for $1.50 per square foot were the most comparable to his property. He believed his property was worth more than any of these industrial properties and, in particular, more than the 245-acre property, which was restricted under an agricultural preserve agreement and would require archaeological studies be completed before development. He believed this 245-acre property showed him "the floor, the bottom of the market" for his property.

De La Fuente testified he believed his valuation was reasonable in light of the county's proposed land lease to the state of 4 acres for a 200- or 400-bed RTC facility. De La Fuente explained that using the county's figures, the land was worth $8.33 per square foot for a 200-bed facility and $14.06 per square foot for a 400-bed facility, considerably more than his valuation of $6.50 per square foot for the usable portion.

During cross-examination, De La Fuente admitted he had valued the property from September 1987 to February 1990 using a highest and best use of industrial or private detention facility at $27,478,000, based on valuing the unusable property at $.18 per square foot and the usable property at $2.13 per square foot. He explained he changed his valuations because he had not done "the economics to see what that use would bring," a deposition of the Director of Office of Special Projects for San Diego County, Richard Robinson, had revealed "this particular land had the necessary infrastructure to be able to hold 6,000 beds, and that was a number that [he] had not quantified before," he learned of the county's proposed land lease for a 200- or 400-bed facility and he had consulted an expert in private detention facilities, Thomas, who "gave us the supply and demand side equation" and "explained to us the economics."

Thomas testified about his evaluation of the property as a potential site for a 6,000-bed privately operated detention facility and about private detention facilities. Thomas testified there was a growing demand for prison space and De La Fuente's property was "ideal" for a private detention facility because of its size, terrain, proximity to the courts and state prison, infrastructure and

its zoning. He testified about the typical operating costs for different detention facilities based on a per inmate per diem basis.[3] Thomas also testified about advantages of private detention facilities, including the ability of a private firm to bring a facility "on line" in 12 to 18 months versus 3 to 5 years for the government, the greater ability of a private firm to delete unnecessary components, and the ability of a private firm to provide an improved quality of service at a lower operating cost.

On cross-examination, Thomas admitted there were no 6,000-bed private detention facilities existing anywhere in the world and that in California the largest was a "standardized sort of cookie cutter kind of facility called for by the California Department of Corrections" of 200 beds.

De La Fuente's appraiser, Howard Berkson concluded the property was worth a total of $66,080,000: $63.8 million or $6.56 per square foot for the usable land and $2,280,000 or $.17 per square foot for the unusable land. Berkson first looked at five sales of undeveloped land which were zoned for future industrial use and sold at prices ranging from $1.15 to $1.63 per square foot, plus a sale, sale No. 10, which Berkson calculated involved an allocation of $3.22 per square foot to the land costs.[4] Based on using these industrial comparable sales, Berkson valued the property at $2.82 per square foot for the entire property, but he did not believe these sales were truly comparable because the highest and best use of De La Fuente's property was for a private detention facility. Since there were no comparable sales of private detention facilities, Berkson used a rental income and income value rate approach.

Berkson based his analysis on a 6,000-bed facility. He computed an income per inmate per day of $47, subtracted operating costs (including personnel, food, medical, utilities, insurance, etc.) and the industry standard on profit and overhead to arrive at a rental income of $4.58 per inmate per day. Berkson then looked to "the marketplace to see what sort of return a land owner would want on his land, knowing that he was going to get this sort of income" and capitalized this income at about 10 percent.

Berkson compared his figures to the county's proposed ground lease to the state of four acres for $180,000 if there was a two hundred-bed facility, and

---

[3]Thomas testified the per diem operating costs for an inmate were about $30/day in a minimum security facility, about $50 to $55/day in a medium security facility and about $55 to $60/day in a maximum security facility.

[4]As the county points out in its briefs, Berkson may have miscalculated the price per square foot allocated to sale No. 10. Berkson's data indicate this property sold for $18,038,412 and that the "Ratio of land to total price is 19.2%." If one multiplies $18,038,412 by 19.2 percent, the allocation to the land was $3,463,375.10, which when divided by the net square feet of the property (1,644,390), equals a price of $2.11 per square foot.

concluded the value of the property, using the county's figures, would be about $77 million.

On cross-examination, Berkson admitted he had initially valued the property in early 1990 at $22,370,000.

The county's appraiser, David Yerke, appraised the property at $5,129,897: $20,700 per acre or $.48 per square foot for the usable portion and $2,300 per acre or $.05 per square foot for the unusable portion based on a highest and best use as future residential, a use consistent with the property's zoning. Yerke testified about 6 sales of property zoned residential or future residential (including De La Fuente's 1982 purchase of the property) which ranged in size from 321 to 3,912 acres and in sales price from $.07 per square foot to $.34 per square foot. Yerke also testified about sales of 3 other properties with industrial potential ranging in size from 81 to 240 acres, which sold at $1.15, $1.22, and $1.49 per square foot.

On cross-examination, Yerke admitted he would not choose to live next to a state prison.

The county also presented evidence there were extended discussions before De La Fuente's land was zoned for future residential use and it was unlikely De La Fuente would have been able to obtain a permit for industrial development within a reasonable time after the valuation date because the community plan contemplated only interim uses rather than extensive investment in permanent structures.

During the trial, there was also evidence brought out that previous county appraisers had valued De La Fuente's property based on a highest and best use as industrial land.

The jury returned a verdict of $55,661,480. A juror declaration indicated the jury had valued the usable property at $6.50 per square foot, subtracted $2 per square foot for infrastructure and arrived at a total of $4.50 per square foot for the usable portion and valued the unusable portion of the property at $.18 per square foot.

The county moved for a new trial based on the erroneous admission of evidence relating to the highest and best use of the property as a private detention facility, juror misconduct, De La Fuente's arguments relating to

the county's "deception,"[5] insufficiency of the evidence and excessive damages. The court rejected the county's arguments a new trial was justified based generally on the admission of evidence and instructions about the highest and best use of the land for a private detention facility, juror misconduct and the references to the county's deception.

In addressing the sufficiency of the evidence and excessive damages, grounds which the court treated as reaching the same issue, the court specifically disagreed with the county's position the highest and best use of the land was residential. The court noted the county's own expert stated he would not like to live in a home overlooking the state prison and admitted he did not investigate whether his premise of residential use (based on the current zoning) was correct. The court also responded on the basis of its viewing of the property during the jury's visit to the site, specifically pointing to the view of the prison "within its barbed wire and lit up like a facility [the court had] never seen lit up before."

At the hearing on the new trial motion, the court expressed skepticism about the change in valuation of De La Fuente and Berkson a few months before trial, which had been $18 million to $30 million, to $64 million to $79 million at the time of trial. The court stated, "I must ask myself, is this reasonable for people as sophisticated as Mr. De La Fuente and Mr. Berkson to apparently have so little understanding of the fair market value of the subject property as of an earlier point in time, just a few months before trial . . . ." The court indicated it required more time to reach a decision.

The court eventually concluded, in a written statement, that the verdict was excessive. The court believed the most relevant market data for determining the fair market value of the property were Berkson's sales. The court found Berkson's first five sales were inferior to De La Fuente's properties as to highest and best use because De La Fuente's property was suitable for those same uses as well as for a private detention facility.

The court found Berkson's sale No. 10, which involved a property which Berkson calculated sold at $3.22 per square foot,[6] was "clearly superior to the subject property" because of its location, topography, size and shape. The court also erroneously stated sale No. 10 was commercially zoned (the property was industrially zoned). The court found Berkson

---

[5]These arguments related to the county's negotiations with Wackenhut to construct detention facilities on the subject property and the county's failure to tell its appraiser, Yerke, about previous appraisals based on a highest and best use as industrial property or to tell him about the negotiations with Wackenhut.

[6]See footnote, 4 *ante*, page 1054.

had supplied no "credible reason" to support his conclusion De La Fuente's property "was worth at least twice as much as his sale #10, or, for that matter, why the subject property was worth several times the value of the industrial sales in the area."

The court also found Berkson's rental income or capitalization approach was "not believable as it lacked a proper foundation and was highly speculative." The court explained: "Initially, it should be noted that the experts of the property owners testified that because the 'privatization' of penal facilities is such a new and developing field there exists no market data anywhere in the country representing fair market value of property devoted to such a use. Applying a reasonable rental income or capitalization approach to value an improved property never devoted to such a use by deducting anticipated operating costs, cost of construction, and land and construction carrying costs from anticipated rental income per inmate is highly speculative and, in the instant case, shed no light on the fair market value of the subject property. Further, Mr. Berkson's assumption of a 6,000 inmate population predicated upon criminal inmate population increases of 1,000 per year was speculative."

The court, "after weighing the evidence" was "convinced from the entire record" that the verdict was excessive and not supported by the evidence. The court determined $22,886,200 represented the fair market value of the property. The court issued an order granting a new trial unless De La Fuente accepted a remittitur to $22,886,200. De La Fuente declined the reduced amount and elected to appeal the new trial order.

After trial, the court, on De La Fuente's motion, ordered the county to increase the deposit of probable compensation by $16,486,200 plus interest. The county deposited an additional $21,564,594.38 pursuant to the court's order.

On appeal, De La Fuente challenges the trial court's order of a new trial. The county contends the judgment should be reversed based on the improper admission of evidence relating to valuation of the property as a detention center, De La Fuente's attempt to "inflame" the jury and turn it into "a tort case for 'deception,'" the improper refusal of its jury instructions, the improper restriction of Yerke's testimony and on all the grounds raised in its motion for a new trial. The county also contends the court erred in increasing the amount of probable compensation.

I

*Valuation Based on Use as a Private Detention Facility*

■ When the government takes property by exercising its power of eminent domain, it must pay "just compensation" to the property owner for the property taken. (U.S. Const., 5th Amend.; Cal. Const., art. I, § 19.) " 'The principle sought to be achieved by this concept [of just compensation] "is to reimburse the owner for the property interest taken and to place the owner in as good a position pecuniarily as if the property had not been taken." [Citation].' " (*People* ex rel. *Dept. of Water Resources* v. *Andresen* (1987) 193 Cal.App.3d 1144, 1163 [238 Cal.Rptr. 826].) ■ Fair market value is the measure of just compensation for property taken in eminent domain. (Code Civ. Proc., § 1263.310; *Redevelopment Agency* v. *Tobriner* (1989) 215 Cal.App.3d 1087, 1101 [264 Cal.Rptr. 481].) As a general rule, the "fair market value of the property taken is the highest price on the date of valuation that would be agreed to by a seller, being willing to sell but under no particular or urgent necessity for so doing, nor obliged to sell, and a buyer, being ready, willing, and able to buy but under no particular necessity for so doing, each dealing with the other with full knowledge of all the uses and purposes for which the property is reasonably adaptable and available." (Code Civ. Proc., § 1263.320, subd. (a).)

The property taken is valued based on the highest and best use for which it is geographically and economically adaptable. (*City of Los Angeles* v. *Decker* (1977) 18 Cal.3d 860, 867 [135 Cal.Rptr. 647, 558 P.2d 545].) A determination of the property's highest and best use is not necessarily limited to the current zoning or land use restrictions imposed on the property; the property owner "is entitled to show a reasonable probability of a zoning [or other change] in the near future and thus to establish such use as the highest and best use of the property. [Citations.]" (*Ibid.*; *People* ex rel. *Dept. of Public Works* v. *Donovan* (1962) 57 Cal.2d 346, 352-353 [19 Cal.Rptr. 473, 369 P.2d 1]; *City of Pleasant Hill* v. *First Baptist Church* (1969) 1 Cal.App.3d 384, 416 [82 Cal.Rptr. 1].) The property owner has the burden of showing a reasonable probability of a change in the restrictions on the property. (*City of Los Angeles* v. *Decker, supra,* 18 Cal.3d 860, 868.)

■ It is long settled that the condemned property may not be valued based on its special value to the property owner. (*United States* v. *Cors* (1949) 337 U.S. 325, 333 [93 L.Ed. 1392, 1399, 69 S.Ct. 1086]; *City of Los Angeles* v. *Decker, supra,* 18 Cal.3d 860, 866; *San Diego Land etc. Co.* v. *Neale* (1888) 78 Cal. 63, 74-75 [20 P. 372]; *City of Stockton* v. *Vote* (1926)

76 Cal.App. 369, 403 [244 P. 609].) "Mere frustration of the owner's plans is not generally compensable . . . ." (*City of Pleasant Hill* v. *First Baptist Church, supra,* 1 Cal.App.3d 384, 404.) "Evidence of the owner's plan of development is not admissible where its purpose is to show loss of profit or enhanced damages which would be suffered by being prevented from carrying out a particular scheme of improvement. [Citations.]" (*San Bernardino County Flood Control Dist.* v. *Sweet* (1967) 255 Cal.App.2d 889, 899 [63 Cal.Rptr. 640].) "Speculative and conjectural calculations of prospective receipts and expenditures and consequent profits to be derived from a prospective enterprise not only throw no light on the issue of the market value of the land to be used in the enterprise, but operate to confuse and mislead the mind of the jurors. [Citation.]" (*East Bay Mun. Utility Dist.* v. *Kieffer* (1929) 99 Cal.App. 240, 250-251 [278 P. 476], overruled on other grounds in *County of San Diego* v. *Miller* (1975) 13 Cal.3d 684, 693 [119 Cal.Rptr. 491, 532 P.2d 139].) Thus, the cases have generally held that a property owner may not value his property based upon its use for a projected special purpose or for a hypothetical business. (See *City of Los Angeles* v. *Retlaw Enterprises, Inc.* (1976) 16 Cal.3d 473, 488 [128 Cal.Rptr. 436, 546 P.2d 1380]; *People* ex rel. *Dept. of Water Resources* v. *Andresen, supra,* 193 Cal.App.3d 1144, 1161; *San Bernardino County Flood Control Dist.* v. *Sweet, supra,* 255 Cal.App.2d 889, 899-900; *Laguna Salada etc. Dist.* v. *Pac. Dev. Co.* (1953) 119 Cal.App.2d 470, 476 [259 P.2d 498]; *City of Stockton* v. *Vote, supra,* 76 Cal.App. 369, 403.) "The hypothetical business rule . . . follows a line of authority beginning with *Sacramento etc. R. R. Co.* v. *Heilbron* (1909) 156 Cal. 408 . . . that holds valuation of property based on hypothetical businesses to be too speculative to determine a realistic fair market value for the property on which the potential business is located. The prohibition against capitalization earnings for hypothetical businesses is a practical rule applied where property has many possible uses. Where property has several potential uses, condemnees could pick and choose the most profitable hypothetical use for their property and evaluate the property at inflated rates." (*People* ex rel. *Dept. of Water Resources* v. *Andresen, supra,* 193 Cal.App.3d 1144, 1161.)

While a property owner may not generally present evidence of the value of his property " 'in terms of money' " that the property would bring for a special purpose (see *City of Stockton* v. *Vote, supra,* 76 Cal.App. 369, 403), evidence of a particular use may be relevant to establishing the highest and best use since such evidence may tend to establish the property's adaptability for that kind of use (see *City of Los Angeles* v. *Retlaw Enterprises, Inc., supra,* 16 Cal.3d 473, 488; *Spring Valley W.W.* v. *Drinkhouse* (1891) 92 Cal. 528, 533-534 [28 P. 681], overruled on other grounds in *County of Los*

*Angeles* v. *Faus* (1957) 48 Cal.2d 672, 680 [312 P.2d 680]; *San Bernardino County Flood Control Dist.* v. *Sweet, supra,* 255 Cal.App.2d at pp. 899-900).

■ The law also recognizes that when the government takes property (either by eminent domain or inverse condemnation) which has a preexisting special use, it may be required to compensate the owner for taking or damaging the owner's use. (See, e.g., *Inyo Chemical Co.* v. *City of Los Angeles* (1936) 5 Cal.2d 525 [55 P.2d 850] [inverse condemnation action; compensation based on damage flooding caused to preexisting mining business held proper]; *Natural Soda Prod. Co.* v. *City of L.A.* (1943) 23 Cal.2d 193 [143 P.2d 12], cert. den. 322 U.S. 768 [88 L.Ed. 1594, 64 S.Ct. 942] [inverse condemnation action; compensation based on damage flooding caused to preexisting mining business held proper]; *People* ex rel. *Dept. of Water Resources* v. *Andresen, supra,* 193 Cal.App.3d 1144, 1160-1164 [eminent domain action, valuation based on preexisting quarry held proper]; *City of Commerce* v. *National Starch & Chemical Corp.* (1981) 118 Cal.App.3d 1 [173 Cal.Rptr. 176] [eminent domain action; severance damages based on accelerated depreciation of fixtures and loss of expansion ability of existing adhesive manufacturing facility held proper]; *Ventura County Flood Control Dist.* v. *Security First Nat. Bank* (1971) 15 Cal.App.3d 996 [93 Cal.Rptr. 653] [eminent domain action; severance damages due to loss of productivity of preexisting lemon grove on remainder due to taking of trees which served as windbreak held proper]; *City of Pleasant Hill* v. *First Baptist Church, supra,* 1 Cal.App.3d 384 [eminent domain action, severance damages based on loss for future growth of preexisting church held proper].)

Finally, the law recognizes there are some special purpose properties such as schools, churches, cemeteries, parks and utilities for which there is no relevant market and therefore these properties may be valued on any basis which is " 'just and equitable.' " (*Redevelopment Agency* v. *Tobriner, supra,* 215 Cal.App.3d 1087, 1101-1102; *Pacific Gas & Electric Co.* v. *Zuckerman* (1987) 189 Cal.App.3d 1113, 1135 [234 Cal.Rptr. 630]; Code Civ. Proc., § 1263.320, subd. (b); Evid. Code, § 823.)

As the comment to subdivision (b) of Code of Civil Procedure section 1263.320 explains: "subdivision (b) has been added to the definition because there may be no relevant market for some types of special purpose properties such as schools, churches, cemeteries, parks, utilities, and similar properties. All properties, special as well as general, are valued subject to the limits of Article 2 (commencing with Section 810) of Chapter 1 of Division 7 of the Evidence Code. The Evidence Code provides that, regardless of whether there is a relevant market for property, its fair market value may be determined by reference to matters of a type that reasonably may be relied upon

by an expert in forming an opinion as to the value of property including where appropriate, but not limited to, (1) the market data (or comparable sales) approach, (2) the income (or capitalization) method, and (3) the cost analysis (or reproduction less depreciation) formula." (Legis. committee com., 19A West's Ann. Code Civ. Proc. (1982) § 1263.320, p. 39.)

Just as the property may not be valued based on its special value to the owner, the property may not be valued on the basis of its special value to the government. (*Merced Irrigation Dist.* v. *Woolstenhulme* (1971) 4 Cal.3d 478, 487-491 [93 Cal.Rptr. 833, 483 P.2d 1].) "The California Supreme Court early stated 'it seems monstrous to say that the benefit arising from the proposed improvement is to be taken into consideration as an element of the value of the land.' (*San Diego Land etc. Co.* v. *Neale, supra,* 78 Cal. 63, 75 . . . .)" (*Pacific Gas & Electric Co.* v. *Zuckerman, supra,* 189 Cal.App.3d 1113, 1127.) It has been held that the government's purpose in condemning the land "is wholly [*sic*] irrelevant." (*People* v. *La Macchia* (1953) 41 Cal.2d 738, 754 [264 P.2d 15], overruled on other grounds in *County of Los Angeles* v. *Faus, supra,* 48 Cal.2d 672, 680, see also *Merced Irrigation Dist.* v. *Woolstenhulme, supra,* 4 Cal.3d 478, 491.) The general rule is designed to prevent "[p]urchasers of property that is known to be condemned . . . from inflating the value of the property by conjecturing what the condemner will actually pay for the property. [Citation.]" (*People* ex rel. *Dept. of Water Resources* v. *Andresen, supra,* 193 Cal.App.3d 1144, 1156.)

The courts, however, have recognized some proposed uses of the property may be carried out by either a public entity or by a private individual and that sometimes the government's proposed use of the property is also the highest and best use of the property in the hands of a private property owner. In such situations, the property owner is allowed to value the property based on a highest and best use which also happens to be the use proposed by the government entity. Thus, in some early cases, property owners whose land was sought to be condemned for reservoir purposes, were permitted to present evidence that the highest and best use of the land was as a reservoir site. (See, e.g., *San Diego Land etc. Co.* v. *Neale, supra,* 78 Cal. 63, 71; *City of Stockton* v. *Vote, supra,* 76 Cal.App. 369, 404-405.) More recently, a property owner whose land was condemned for a rock quarry to provide material to repair a dam was allowed to value the property based on a highest and best use as a rock quarry although the quarry had not been used since the original construction of the dam and the land had been used as pasturage in the interim. (*People* ex rel. *Dept. of Water Resources* v. *Andresen, supra,* 193 Cal.App.3d 1144, 1159-1160.)

Finally, in *City of Los Angeles* v. *Decker, supra,* 18 Cal.3d 860, a property owner whose residential property was condemned was allowed to show the

highest and best use of the property was for airport parking although the city's intended use for the property was also airport parking. As the Supreme Court explained in the *Decker* case: "[The] admissibility [of the property owner's evidence that airport parking was the highest and best use of the land] would seem to be a natural corollary to the well established rule that 'if, however, the condemnor's proposed use is one of the highest and best uses of the property, the adaptability of the property for that purpose may be shown by the property owner.' [Citation.] *Woolstenhulme* does not bar such evidence, since it only precludes the valuation of the condemned property as part of the proposed improvement. The city's determination as to the adaptability of the property for airport parking purposes was relevant to show that *the property in the hands of defendant and not as part of the project* could have been used for airport parking. In other words, this evidence buttressed the testimony of defendant's witness that there was a present need for airport parking and that her land was in a suitable location to fulfill that need." (*City of Los Angeles* v. *Decker, supra,* 18 Cal.3d 860, 869, italics in original.)

Cases where the property owner was allowed to show the highest and best use of property was the same use as the condemner's proposed use must be distinguished from those cases where the government provides the only market or demand for the proposed use. ▪▪▪ In situations where the market or demand is created by the government, then valuing the property on that basis is improper; such a valuation is tantamount to a valuation of the property in the hands of the condemner.

Thus, in one of its earliest cases the California Supreme Court held inadmissible evidence valuing property as a fortification since the government provided the only market for that use. (*Gilmer* v. *Lime Point* (1861) 19 Cal. 47.) On similar grounds, the court in *City of Redding* v. *Diestelhorst* (1936) 15 Cal.App.2d 184, 193-194 [59 P.2d 177] rejected the property owner's attempt to value the land as a bridge site, explaining: "It is practically conceded by the two witnesses called by defendant that the demand for bridge sites is very limited and that available sites are numerous, and that outside of the state or municipality they knew of no prospective buyers for bridge sites in the vicinity of Redding. It seems, therefore, the witnesses were basing their estimate of market value of the land sought to be condemned in this action solely upon the ground that the City of Redding needed it to carry out the terms of its contract with the California Highway Commission, and that there was no potential demand for bridge sites from any other source. Such testimony is inadmissible. [Citation.] This situation is analogous to that presented in *Gilmer* v. *Lime Point,* 19 Cal. 47, where the owner attempted to prove the value of the premises as a site for a government fortification. Such evidence was held inadmissible because there was

no market for the land for such purposes, competition being essential to a market and the government being of necessity without a competitor for the purchase of land for purposes of fortification."

The United States Supreme Court has recognized this problem in the context of a government-created demand for tug boats in the time of war:

"In time of war or other national emergency the demand of the government for an article or commodity often causes the market to be an unfair indication of value. The special needs of the government create a demand that outruns the supply. The market, sensitive to the bullish pressure, responds with a spiraling of prices. The normal market price for the commodity becomes inflated. And so the market value of the commodity is enhanced by the special need which the government has for it.

". . . . . . . . . . . . . . . . . . . . . . . .

"It is not fair that the government be required to pay the enhanced price which its demand alone has created. That enhancement reflects elements of the value that was created by the urgency of its need for the article. It does not reflect what 'a willing buyer would pay in cash to a willing seller,' [citation], in a fair market. It represents what can be exacted from the government whose demands in the emergency have created a sellers' market. In this situation, as in the case of land included in a proposed project of the government, the enhanced value reflects speculation as to what the government can be compelled to pay. That is a hold-up value, not a fair market value. That is a value which the government itself created and hence in fairness should not be required to pay." (*United States* v. *Cors, supra,* 337 U.S. 325, 333-334 [93 L.Ed. 1392, 1399-1400]; see also *Merced Irrigation Dist.* v. *Woolstenhulme, supra,* 4 Cal.3d 478, 491, holding a property owner is not entitled to " 'project enhanced value' " based on the likelihood his property will become part of the government's project.)

What can be gleaned from the statements of the United States Supreme Court and the few California cases is that the "market" for determining "fair market value" and just compensation is the private marketplace, i.e., what willing, knowledgeable nongovernmental buyers and sellers would pay for property to be used for a nongovernmental purpose. Thus, remote desert property which is essentially valueless to the private marketplace may not be based on its use for such strictly governmental uses as a nuclear testing site, military base or detention facility; it must be valued on private uses such as agriculture, recreation, residential, commercial or industrial. To value property based on a market where the government is the only potential buyer is

to engage in improperly valuing the property based on its value to the condemner rather than based on the loss suffered by the property owner. It is the loss suffered by the property owner which provides the guide for just compensation, a loss measured by the private marketplace; the loss may not be measured by the benefit to the condemner. (See *Merced Irrigation Dist.* v. *Woolstenhulme, supra,* 4 Cal.3d 478, 492 ["Almost all courts universally agree . . . an increase in value, based on a purchaser's conjecture of what the condemner may ultimately be required to pay, is not a proper element of 'fair market value' for 'just compensation' purposes. [Citations.]".)

■ Here, not only was De La Fuente's proposed use as a detention facility the same as the county's proposed use of the land but it was also a use which is uniquely governmental, that is, only the government provides a market for detention facilities. De La Fuente's valuation based on "supply and demand" was a valuation based solely on the government's supply of inmates and demand for prison/jail beds. There is no equivalent private sector "supply and demand." Whether a detention facility is directly constructed by the government and operated by government employees or is indirectly constructed and operated by the government through a lease payment and a contract with a private company to operate the facility, a detention facility remains a governmental function with no private sector equivalent.[7]

The fact the market for detention facilities is limited to the government is demonstrated by De La Fuente's own evidence. De La Fuente and his expert, Berkson, rejected a comparable sales approach for valuing the land used as a private detention facility because of the lack of market and sales for detention facilities. Instead, they used an approach based on what the government would pay for detention facilities. They referred to figures in negotiations between the county and state governments for a 200- or 400-bed facility and to figures of what the government would pay for inmates on a per diem basis. De La Fuente's evidence of value and use was premised on a government use of the facilities.

De La Fuente's valuation based on a private detention facility is not like the airport parking lot in *City of Los Angeles* v. *Decker, supra,* 18 Cal.3d 860,

---

[7]De La Fuente contends we may not reverse the judgment based on a conclusion the property should not have been valued as a private detention facility because the county stipulated "that the subject property is feasible, suitable and reasonably probable for the use of a private detention facility as of the date of value." The stipulation is not a concession by the county that De La Fuente's property could be *valued* based on use as a private detention facility. In context, the stipulation is no more than an abandonment of the county's earlier untenable, and in this context irrelevant, position that private detention facilities are illegal per se.

where the property owner wanted the same use in different hands (i.e., in the hands of the property owner rather than the city). De La Fuente's valuation is based on showing the same use (a detention facility) in the same hands, that is, he wanted to value the property based on the government's use of the property for detention purposes through a lease from De La Fuente and contract with a private company for management purposes. This valuation was improperly based on the value of the property to the condemner.

We further note the property here was not "special purpose" property like those involving schools, cemeteries or churches or like those properties involving a preexisting special business. The land here was vacant, undeveloped land suitable for a variety of uses, including agricultural, residential or industrial. There was a market for this property in the private marketplace as demonstrated by the evidence De La Fuente, Berkson and Yerke presented of sales of comparable property in the area. The "uniqueness" of De La Fuente's property resulted only when the property was valued based on its value to the government for a uniquely governmental use.

We conclude the court erred in allowing De La Fuente to value the property based on its highest and best use as a detention facility. Accordingly, we must reverse the judgment. Because we reverse the judgment, we need not discuss the county's various challenges to the evidence and instructions relating to the use of the property as a detention facility nor do we need to discuss De La Fuente's challenges to the trial court's grant of a new trial; these issues are mooted by our decision that evidence relating to the use of the property for a detention facility should have been excluded.[8]

## II

### Increase in the Deposit of Probable Compensation

The county contends the court erred in ordering an increase in its deposit of probable compensation because the court erroneously calculated the

---

[8]We note the trial court's decision to grant a new trial based on its conclusion Berkson's valuation opinion was based on conjecture and speculation was within its discretion. The county's description of De La Fuente's proposed 6,000-bed detention facility as a "fantasy jail" is not inapt. While there was evidence the property could support such a large facility, other evidence showed there were no 6,000-bed facilities existing anywhere in the world and the largest facility in California was a "standardized sort of cookie cutter kind of facility" of 200 beds. Further, while there was evidence showing a potential inmate population to fill 6,000 beds, there was no evidence showing any governmental entity had a reasonable probability of financing such a facility any time in the near future. The county itself lacked funding for phase two of its proposed project which was intended to add an additional 1,040 beds to the 1,040 completed in phase one.

probable compensation of $22,886,200 by relying on Berkson's sale No. 10, which the county contends was not comparable because it was a sale of improved property, and by adopting Berkson's conclusion sale No. 10 resulted in a sales price of $3.22 per square foot,[9] and erred in requiring a deposit of interest.

■ As to the county's contention the court improperly required the county to deposit prejudgment interest, the county cites no authority holding such an order is improper.

Under the Eminent Domain Law (Code Civ. Proc., § 1230.010 et seq.), "[a]t any time before entry of judgment, the [public entity] may deposit with the court the probable amount of compensation, based on an appraisal, that will be awarded in the proceeding." (Code Civ. Proc., § 1255.010, former subd. (a).)[10] The public entity must give notice of the deposit and the basis of the appraisal to the parties in the action. (Code Civ. Proc., § 1255.020, subds. (a) & (b).) "At any time after a deposit has been made . . . the court shall, upon motion of the [public entity] or of any party having an interest in the property for which the deposit was made, determine or redetermine whether the amount deposited is the probable amount of compensation that will be awarded in the proceeding." (Code Civ. Proc., § 1255.030, subd. (a).) If the court determines the amount of probable compensation exceeds the deposit, the court may order the public entity to increase the amount of the deposit. (Code Civ. Proc., § 1255.030, subds. (b) & (c).)

Code of Civil Procedure, section 1268.110 addresses deposits made following the entry of judgment:

"(a) Except as provided in subdivision (b), the plaintiff may, at any time after entry of judgment, deposit with the court for the persons entitled thereto the full amount of the award, together with interest then due thereon, less any amounts previously paid directly to the defendants or deposited pursuant to Article 1 (commencing with Section 1255.010) of Chapter 6 [addressing deposits of probable compensation].

"(b) A deposit may be made under this section notwithstanding an appeal, a motion for a new trial, or a motion to vacate or set aside the judgment but may not be made after the judgment has been reversed, vacated, or set aside.

[9]See footnote 4, *ante*, pages 1054.

[10]In 1990, the Legislature amended Code of Civil Procedure section 1255.010, subdivision (a) to provide for deposit of the amount of probable compensation with the State Treasury rather than with the court. (Stats. 1990, ch. 1491, § 9.)

"(c) Any amount deposited pursuant to this article on a judgment that is later reversed, vacated, or set aside shall be deemed to be an amount deposited pursuant to Article 1 (commencing with Section 1255.010) of Chapter 6."

Code of Civil Procedure section 1268.130 gives the court authority to increase the amount of the postjudgment deposit: "At any time after the plaintiff has made a deposit upon the award pursuant to Section 1268.110, the court may, upon motion of any defendant, order the plaintiff to deposit such additional amount as the court determines to be necessary to secure payment of any further compensation, costs, or interest that may be recovered in the proceeding. After the making of such an order, the court may, on motion of any party, order an increase or a decrease in such additional amount. . . ."

While the statutory scheme mentions interest as part of the postjudgment deposit and not as part of a prejudgment deposit, that does not lead to a conclusion an increase in the deposit to include interest before judgment or after an order granting a new trial is improper. The amount of the deposit is intended to reflect the amount of probable compensation which will be awarded in the eminent domain proceeding. Just compensation under the California and federal Constitutions may require an award of interest so that the property owner receives the " 'full and perfect' monetary equivalent of the fair market value of the land" if payment of the full amount of compensation is not contemporaneous with the taking. (*Redevelopment Agency* v. *Gilmore* (1985) 38 Cal.3d 790, 801 [214 Cal.Rptr. 904, 700 P.2d 794]; *Salton Bay Marina, Inc.* v. *Imperial Irrigation Dist.* (1985) 172 Cal.App.3d 914, 959 [218 Cal.Rptr. 839].) It therefore follows that a court may order an increase in a deposit of "probable compensation" when it appears the original deposit was inadequate and the passage of time indicates an award of interest will be necessary to provide the property owner with the " 'full and perfect' monetary equivalent of the fair market value of the land." (*Redevelopment Agency* v. *Gilmore*, *supra*, 38 Cal.3d at p. 801.)

We find no abuse of discretion in the court's inclusion of interest in its order increasing the amount of the county's deposit. The amount of interest, however, will have to be recalculated in light of our conclusion the property should not have been valued based on a highest and best use as a detention facility.

## DISPOSITION

The judgment is reversed. The county is awarded costs on appeal.

Benke, J., and Froehlich, J., concurred.

A petition for a rehearing was denied July 13, 1993. and the petition of defendants and appellants for review by the Supreme Court was denied September 16, 1993.