[No. A063585. First Dist., Div. Three. Apr. 28, 1995.]

THE PEOPLE, Plaintiff and Respondent, v.
RODNEY DORSEY et al., Defendants and Appellants.

**[Opinion certified for partial publication.*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part IV.

**COUNSEL**

Susan D. Shors and Guy A. Campisano, Jr., under appointments by the Court of Appeal, for Defendants and Appellants.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Ronald S. Matthias and Richard Rochman, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**MERRILL, J.**—Rodney Dorsey and Charles S. Hall appeal from jury convictions of second degree robbery and assault with force likely to produce great bodily injury. They contend that the trial court erred in denying a mistrial based on juror misconduct, and by refusing a requested jury instruction on grand theft as a lesser included offense of robbery. In addition, Dorsey claims sentencing error. The People acknowledge that the record of the sentencing hearing in respect to Dorsey is ambiguous and confusing and that there should be a remand for resentencing. In the unpublished portion of this opinion we direct that the action against Dorsey be remanded for resentencing. In all other respects, we affirm the judgments against both appellants.

I

### FACTUAL AND PROCEDURAL BACKGROUND

On April 3, 1993, at 11:45 p.m., Marybeth Tormey and her sister were walking to Tormey's apartment in the San Francisco Marina District when they were accosted by a young Black male on Pierce Street between Chestnut Street and Toledo Way. As the man crossed their path, he said, "Hey, what's up?" Tormey's sister started to run away. The man lunged at Tormey, who fell into the street. As Tormey lay in the street, curled in a fetal position and screaming, the man squatted on top of her and began trying to remove her "fanny pack" which was strapped around her waist with a buckle in the back. Tormey testified that after struggling with her, during which time he "ripped up" and scarred her arm, her assailant managed to detach the fanny pack. As soon as he did so, he took it and quickly got into a nearby car which was idling, and departed.

During Tormey's struggle with the robber, his face was between 12 and 15 inches from hers, and she was able to get a good look at him. Tormey positively identified the man as appellant Hall; she had "no question" in her mind but that Hall was the robber. She described him to police as a Black male in his early 20's, about 5 feet 6 inches in height, weighing 140 pounds, and wearing white sneakers, a red shirt, a jeans jacket, and a hat. Tormey also identified the car in which Hall escaped as a white or light yellow car with a black hatchback.

On April 8, 1993, at 8:30 p.m., San Francisco Police Officer Robert Sanchez was driving on Van Ness Avenue approaching Grove Street when he saw a woman sitting alone in a bus shelter across from the opera house.

A small, compact yellow car was parked a few feet away, with one person in the driver's seat. Sanchez saw another individual walking away from the passenger side of the car in the direction of the woman. The man was looking around as he walked. As soon as he saw the police car, the man "immediately did an about face" and walked back toward the parked yellow vehicle. The driver of the yellow car got out and opened the hood of the vehicle and started to act "like he was playing with the engine."

Sanchez made a U-turn and pulled up behind the yellow vehicle. He noticed that the car had no license plate. Sanchez questioned the driver, who told him that the car had no license plate because his sister had just gotten it from a junk yard. The driver produced a driver's license, identifying him as appellant Hall. After Officer Sanchez was unable to obtain any identification from the passenger, he sent them on their way. Officer Sanchez identified both appellants from booking photographs taken on April 9, 1993, as the two individuals he saw in the yellow vehicle.[1]

Later, at 9:40 p.m. that evening, Marilyn Barletta was walking north in the 2100 block of Larkin Street near Green Street when a car drove up from behind and stopped abruptly in the middle of the street slightly ahead of her. A man got out of the car and approached her at an angle. The man asked her if he could speak to her for a moment. Barletta said no. She "felt very threatened" and knew she "was in trouble." She started to run north. The man grabbed Barletta's jacket from behind and tried to "unbalance" her or pull her down. When Barletta remained standing, the man grabbed one of the two straps of Barletta's shoulder bag. A struggle ensued, in which Barletta got entangled in the other strap of her purse and was thrown against a parked car, injuring both her knee and her shoulder. Her shoulder hit the car with such force that it dented the fender, and her knee felt like it shattered.[2] Barletta released her hold on the purse. The man ran back to the car from which he had come, and got into the passenger side. Barletta "hobbled out into the street" to look at the car. She saw that it was a small Honda-type hatchback, cream, yellow or beige in color, with no license plate. There was black primer on the door. The car sped away "so fast that it almost ran over two people that were crossing the street."

One of Barletta's neighbors called the police, who arrived within 10 minutes. Barletta gave the police a description of the assailant's vehicle, and

[1]At trial, Sanchez confused the identities of Hall and Dorsey. He explained that their haircuts at trial were different from those at the time that he saw them on April 8, 1993. Sanchez correctly identified both appellants from their booking photographs taken on April 9, at which time their haircuts were the same as at the time he saw them stopped on Van Ness Avenue. Officer Sanchez had "[n]o question whatsoever" that appellants were the two men he saw at Grove and Van Ness at 8:30 p.m. on April 8, 1993.

[2]Barletta testified that her knee did not shatter, but there was so much bruising and damage to the tissue that it took longer to heal than a break would have taken.

told them that the robber was a young Black male, between five feet three and five feet seven inches tall. Barletta had a good opportunity to view the robber during the struggle.

The police broadcast Barletta's description of the robber at approximately 9:45 p.m. Officer Sanchez heard the broadcast report, which "fit the exact description of the vehicle and the occupants that [he] earlier detained at Grove and Van Ness."

Around 10 p.m. that night, Robin Berman was walking alone on Chestnut Street near Octavia Street, when she saw a small yellow car approaching her. The car stopped at a driveway Berman was about to cross, and a man got out of the passenger side. After exchanging a few words with the driver, the passenger walked toward the apartment house, leaving the passenger door open. As Berman got closer, the man changed his direction, walked towards her, and grabbed her purse, which was hanging at Berman's side by a strap around her neck. Berman's hair caught in the strap. The man pulled both the strap and Berman's hair in an attempt to break the purse free, as Berman struggled to hold onto the purse. After a "tugging war" that lasted about one minute but "seemed like forever," Berman was knocked to the ground, hurting her knees. As Berman fell, the strap broke. The man ran back to the waiting car with the purse, got in, and drove away quickly.

At 10:06 p.m., Berman called the police from a neighbor's house. Berman described the car as a yellow two-door vehicle. She described the assailant as a young Black male wearing a knit cap and a long striped shirt. The police broadcast Berman's description of her assailant and the car at 10:10 p.m.

San Francisco Police Officers Michael Robinson and Nathaniel Holmes were patrolling in a marked police car when they heard the radio broadcast report of the robberies and the description of the two Black men in a two-door yellow Honda-like vehicle with black patches on the vehicle and no license plate. Shortly after hearing the broadcast, the officers saw a car matching the description pulling onto the 280 freeway at the intersection of Sixth and Brannan Streets. The officers stopped the vehicle at the freeway exit at Pennsylvania and 25th Streets at 10:16 p.m.

Police officers brought victim Berman to Pennsylvania and 25th Streets to view the suspects. Berman identified the yellow hatchback as the vehicle that her assailant had used, and she identified the clothes Dorsey was wearing as those of the assailant. She was not able to identify her assailant's face, and she could not identify the second man. Later that night, Berman's purse was found and returned to her, without the cash and her house keys.

On April 10, 1993, San Francisco Police Inspector Jeffrey Levin showed victim Tormey a photographic lineup, admonishing her that she was not obliged to identify anyone in the lineup or assume that the lineup contained the photograph of the robber. Tormey "unhesitatingly" identified the photograph of appellant Hall as that of her assailant. Tormey was "99 percent" certain of her identification of the assailant from the photographic lineup, and 100 percent sure once she saw him in person.

Inspector Levin also showed victim Barletta the photographic lineup on April 10, giving her the same admonition. Barletta identified appellant Dorsey as her assailant. On the photograph, she noted: "if this person is between five-foot three and [five]-foot nine, this is the man who took my purse and dragged me into the parked car."

Neither Hall nor Dorsey testified at trial. Erica Jones testified on behalf of appellant Hall that she and her family spent Saturday, April 3, 1993, with Hall, his wife and children. According to Jones, the two families first got together around 11 a.m. for a birthday party, and then went to the Malibu Grand Prix in Redwood City, where they stayed between 5 and 10:30 p.m. After that, they went to Pier 39 in San Francisco and played video games until after 1 a.m. Jones testified that Hall's car was a yellow two-door Mazda, but that it did not have any black primer on it on April 3.

In rebuttal, the prosecution introduced the testimony of Gary Chung, the general manager of the only video arcade at Pier 39. Chung testified that on April 3, 1993, the arcade closed at midnight, and was cleared of all customers by 12:15 a.m. Security punched out at 12:23 a.m. San Francisco Police Officer Joseph Cinelli testified that on April 3, 1993, at 2:05 p.m., he issued a traffic citation to appellant Hall for driving a vehicle without a license plate. At the time, Hall was alone in the vehicle, which Cinelli identified as the same car which Hall was driving at the time of his arrest.

Appellants Hall and Dorsey were charged in counts II (Barletta) and IV (Berman) with second degree robbery (Pen. Code, § 212.5, subd. (b))[3] and in count III (Barletta) with assault with force likely to produce great bodily injury (§ 245, subd. (a)(1)). Appellant Hall alone was charged in count I (Tormey) with second degree robbery (§ 212.5, subd. (b)). The information alleged that Hall had two prior convictions pursuant to sections 667 and 1192.7 and two prior convictions for which he served prison terms pursuant to section 667.5, subdivision (b), and alleged that Dorsey had one prior conviction pursuant to sections 667 and 1192.7. Both appellants pleaded not guilty and denied the enhancements.

---

[3]Unless otherwise indicated, all further statutory references are to the Penal Code.

Jury trial began on August 17, 1993. On August 26, at 10:15 a.m., the trial court instructed the jury. Thereafter, the jury commenced deliberations. At 2:10 p.m., the trial court suspended deliberations as a result of a report that Juror No. 6 had left the jury room during deliberations. The trial court voir dired the jury foreman, and Juror No. 6, and the remaining jurors. After this, the trial court denied appellants' motions for mistrial, excused Juror No. 6, substituted an alternate juror, and instructed the jury to recommence deliberations from the beginning as though no deliberations had taken place. The reconstituted jury restarted its deliberations. The next day, the jury found appellants guilty of the offenses charged. Appellants admitted their prior convictions.

The trial court denied appellants' motion for a new trial and imposed prison sentences for Hall of 16 years and for Dorsey, according to the abstract of judgment, of 11 years. In addition, the trial court imposed restitution fines of $800 on Hall and $600 on Dorsey. These timely appeals followed.

II

FAILURE TO DECLARE MISTRIAL FOR JUROR MISCONDUCT

■ Both appellants contend that the trial court erred in denying their mistrial motions based on juror misconduct and the separation of the jury, and in employing the assertedly ineffective remedy of discharging the offending juror, substituting an alternate juror, and restarting jury deliberations anew. Appellants' arguments are unpersuasive.

*Factual Background*

Prior to trial, the trial court instructed the jurors as follows: "You are admonished that it is your duty not to converse among yourselves or with anyone else on any subject connected with the trial, or to form or express any opinion thereon until the cause is finally submitted to you." The trial court next gave the jurors examples of "where things go awry," including one situation in which "three or four of the jurors got together on their own and decided the case and told the other nine, we have it all figured out. You don't have to do anything, just rubber stamp the verdict and that will take care of it." The trial court explained that this was a violation of the general admonition, and repeatedly reminded the jurors of the admonition throughout the trial.

On August 26, the trial court gave its instructions on the law and the jury retired to begin deliberations. At 2:05 p.m., the trial court told counsel that

during the lunch break one of the jurors, identified as No. 6, had requested a cigarette break. The trial court had told the bailiff to tell the juror "to hang on" until the attorneys returned from lunch at 1:30 p.m. Half an hour later, the bailiff reported that the juror had walked out of the jury room and then returned after a period of time.

After consulting with counsel, the trial court called the jurors into the courtroom and told them to stop their deliberations. Out of the presence of the jury, the trial court questioned the foreman and Juror No. 6. The foreman stated that although he did not see Juror No. 6 leave the jury room, one of the other jurors reported that she did. During the approximately five-minute period that she was out of the room, the jury did not take any ballots or discuss the facts or evidence. However, they did use the time to debate the wording of a note to send the trial court concerning a point of law. Juror No. 6 told the trial court that she was "addicted to cigarettes and nicotine." When she "really couldn't wait any longer," she left the jury room for less than 10 minutes to smoke a cigarette. She did not speak to anyone. According to Juror No. 6, "The jurors stopped discussing the case when I left, just like we stopped when anyone had to go to the bathroom." When she returned, the jurors "were just chit-chatting waiting for me to get back."

Defense counsel moved for a mistrial, arguing that the remaining jury panel was "irretrievably tainted" by discussing the note to the trial court in the absence of Juror No. 6. Rejecting this argument and denying the motion for a mistrial, the trial court ruled that it would excuse Juror No. 6, appoint an alternate juror, and instruct the jurors to begin their deliberations anew pursuant to CALJIC No. 17.51. The trial court then interviewed the remaining 10 jurors. All were aware that one of the jurors had left, and consciously refrained from discussing the facts or the evidence. Seven jurors, including the foreman, stated that while Juror No. 6 was out of the room, they used the time to formulate a note to the trial court on the law of assault and aiding and abetting. Four jurors appeared to be unaware of any such discussions during the absence of Juror No. 6.

Defense counsel renewed their motion for a mistrial on grounds of juror misconduct. The trial court again denied the motion, stating that it was satisfied that the remaining jurors would follow his instructions to begin their deliberations over again from the beginning with the alternate juror. Thereafter, the trial court excused Juror No. 6, substituted an alternate, and instructed the jury pursuant to CALJIC No. 17.51.[4] The trial court expanded on this formal instruction in its own words, telling the jury that it had to

---

[4]The trial court gave the following instruction pursuant to CALJIC No. 17.51: "One of your number has been excused for legal cause and replaced with an alternate juror. You must not

"start from ground zero" with a "clean" slate; that its previous notes to the court were "moot" and had "no meaning whatsoever" because "the alternate hasn't had the benefit of any of those deliberations"; and that they were to erase all previous notes they had written indicating their previous train of thought. The trial court said it was aware that some members of the jury might think that starting over was a waste of time, and charged the jurors to let it know at that time whether any member could not follow the law and the court's instructions by starting over. None of the jurors indicated any difficulty with following the trial court's instructions.

The reconstituted jury commenced deliberations at 3:15 p.m. The trial court received two notes from the new jury. One of these notes, concerning the law on aiding and abetting in general, was similar to but differently worded from a prior note from the previous jury concerning the relation of degrees of assault to the crime of aiding and abetting.[5] The jury rendered its guilty verdicts at noon the next day.

Defense counsel renewed their request for a mistrial and moved for a new trial, arguing that the similarity of the two notes on aiding and abetting demonstrated that the deliberations of the first jury contaminated those of the second. The trial court denied the motion, determining on the basis of the entire record that even if there was jury misconduct, the totality of the record showed that it was not prejudicial.

*Discussion*

■ In ruling on a request for a new trial based on jury misconduct, the trial court must undertake a three-step inquiry. (*People* v. *Perez* (1992) 4 Cal.App.4th 893, 906 [6 Cal.Rptr.2d 141].) First, it must determine whether the affidavits supporting the motion are admissible. (Evid. Code, § 1150.) If the evidence is admissible, the trial court must determine whether the facts establish misconduct. (*Krouse* v. *Graham* (1977) 19 Cal.3d 59, 79-82 [137 Cal.Rptr. 863, 562 P.2d 1022].) Lastly, assuming misconduct, the trial court

---

consider this fact for any purpose. [¶] The People and the defendants have the right to a verdict reached only after full participation of the 12 jurors who return the verdict. This right may be assured only if you begin your deliberations again from the beginning. [¶] You must therefore, set aside and disregard all past deliberations and begin deliberating anew. This means that each remaining original juror must set aside and disregard the earlier deliberations as if they had not taken place. [¶] You shall now retire to begin anew your deliberations in accordance with all of the instructions that I previously have given to you."

[5]The note from the reconstituted jury read: "Clarification of law—does the law require that a defendant who aids and abets a crime be guilty of the same degree of offense as the person who is a direct participant?" The previous note read: "Clarification of law—if one defendant is decided to be guilty of the greater degree of assault, is the second defendant possibly guilty of only simple assault, if he aided and abetted the robbery?"

must determine whether the misconduct was prejudicial. (*People* v. *Marshall* (1990) 50 Cal.3d 907, 950-951 [269 Cal.Rptr. 269, 790 P.2d 676]; *People* v. *Miranda* (1987) 44 Cal.3d 57, 117 [241 Cal.Rptr. 594, 744 P.2d 1127].) A trial court has broad discretion in ruling on each of these issues, and its rulings will not be disturbed absent a clear abuse of discretion. (*People* v. *Von Villas* (1992) 11 Cal.App.4th 175, 255 [15 Cal.Rptr.2d 112]; *People* v. *Perez, supra,* 4 Cal.App.4th at p. 906; *People* v. *Montgomery* (1976) 61 Cal.App.3d 718, 728-729 [132 Cal.Rptr. 558].)

■ For purposes of the motion for new trial, the trial court assumed that the evidence established jury misconduct. It then went on to find that any such misconduct was not prejudicial.

■ Contrary to appellants' assertion, jury misconduct is not reversible per se. Although jury misconduct does give rise to a presumption of prejudice, the presumption may be rebutted by the prosecution on the basis of the entire record. (*People* v. *Von Villas, supra,* 11 Cal.App.4th at pp. 255-257.) ■ In deciding whether misconduct was prejudicial, the trial court must determine whether there exists a substantial likelihood that some extrinsic material or information improperly influenced the vote of one or more jurors. This is an objective standard. ". . . 'In effect, the court must examine the extrajudicial material and then judge whether it is inherently likely to have influenced the juror.' [Citation.]" (*People* v. *Marshall, supra,* 50 Cal.3d at p. 951.)

■ In this case, neither the misconduct of Juror No. 6 in leaving the room to smoke a cigarette, nor the assumed misconduct of the jurors who discussed the wording of the note to the trial judge in her absence, could have produced any significant effect on the jury's deliberations or the ultimate verdict. There was no realistic possibility that the vote of one or more jurors was influenced by exposure to any prejudicial extrinsic matter. Even if the deliberations of the first jury were somehow suspect, that jury did not decide the case. After dismissing Juror No. 6 and replacing her with an alternate, the trial court strongly admonished the newly reconstituted jury to begin its deliberations again, as though no deliberations had yet taken place at all. After making this admonition, the trial court specifically asked if any jurors would have any difficulty complying with it. None of the jurors expressed any problem or hesitation with following the court's instructions. On these facts, we must presume that the jury followed the instructions. (*People* v. *Anderson* (1990) 52 Cal.3d 453, 483 [276 Cal.Rptr. 356, 801 P.2d 1107]; *People* v. *Collins* (1976) 17 Cal.3d 687, 694 [131 Cal.Rptr. 782, 552 P.2d 742]; *People* v. *Thomas* (1990) 218 Cal.App.3d 1477, 1487 [267 Cal.Rptr. 865].)

Contrary to appellants' assertion, the fact that the reconstituted jury sent the trial court notes similar to ones it had sent prior to the misconduct of Juror No. 6 does not indicate that the jurors failed to heed the trial court's admonition to deliberate anew.[6] To the contrary, it demonstrates that they took that admonition seriously, by discussing the same issues and points of law all over again as though they had not been discussed previously. We conclude that in this case, any presumption of prejudice has been rebutted. (*People* v. *Marshall, supra,* 50 Cal.3d at pp. 951-953.)

### III

### DENIAL OF LESSER INCLUDED OFFENSE INSTRUCTION

■ Both appellants contend that the conviction for robbery from victim Berman must be reversed, because the trial court erred in refusing their request that the jury be instructed on the lesser included offense of grand theft from the person. We disagree.

The California Supreme Court stated the rule in *People* v. *Ramkeesoon* (1985) 39 Cal.3d 346 [216 Cal.Rptr. 455, 702 P.2d 613] as follows: "Theft is a lesser and necessarily included offense in robbery; robbery has the additional element of a taking by force or fear. [Citations.] It is well settled that the trial court is obligated to instruct on necessarily included offenses—even without a request—when the evidence raises a question as to whether all of the elements of the charged offense are present and there is evidence that would justify a conviction of such a lesser offense. [Citations.]" (*Id.* at p. 351.)

With regard to victim Berman, the record contains no evidence to support a conviction of any theft-related offense other than robbery. Berman's assailant grabbed the strap of her purse, which was hanging around her neck. When Berman's hair got caught in the strap, the assailant pulled both the strap and her hair in an attempt to break the purse free. There was a struggle or "tugging war" between the two, which resulted in the strap of the purse breaking. As a result, Berman was knocked to the ground, thereby hurting her knees. On this evidence, Dorsey was either guilty of robbery or he was not the perpetrator and was innocent of any crime. There was simply no factual basis for the jury to conclude that a crime was committed, but no force was used. Because the evidence could only support a finding of robbery, the trial court did not err in failing to instruct the jury on grand theft

---

[6]Aside from the notes on the law of aiding and abetting, the reconstituted jury submitted a note requesting a read-back of portions of victim Tormey's testimony, similar to one sent by the previous jury.

in relation to this count. (*People* v. *Jones* (1992) 2 Cal.App.4th 867, 869-871 [3 Cal.Rptr.2d 602]; *People* v. *Brew* (1991) 2 Cal.App.4th 99, 104-105 [2 Cal.Rptr.2d 851].)

## IV

### SENTENCING*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## V

### DISPOSITION

The cause against appellant Dorsey is remanded for resentencing. In all other respects, the judgments against both appellants Hall and Dorsey are affirmed.

Chin, P. J., and Corrigan, J., concurred.

Appellants' petition for review by the Supreme Court was denied July 19, 1995.

---

*See footnote, *ante*, page 694.