[No. F043467. Fifth Dist. Jan. 6, 2005.]

SIERRA VIEW LOCAL HEALTH CARE DISTRICT, Plaintiff and Respondent, v.
SIERRA VIEW MEDICAL PLAZA ASSOCIATES, LP, Defendant and Appellant.

480

---

### COUNSEL

Demetriou, Del Guercio, Springer & Francis, Jeffrey Z. B. Springer and Bradley D. Pierce for Defendant and Appellant.

Clifford & Brown, James E. Brown and John R. Szewczyk for Plaintiff and Respondent.

---

### OPINION

**DAWSON, J.**—This is a condemnation proceeding to determine the fair market value of the condemnee's property interest in a medical office building taken in eminent domain by a public hospital district. The district, citing the declarations of four jurors, challenged the verdict on the ground it was based in part on factors the jury should not have considered, and it moved for a new trial accordingly. The trial court granted the motion, and the condemnee has appealed. We will reverse.

### FACTS AND PROCEEDINGS

The Sierra View Local Health Care District (the District) is a public entity that owns and operates the Sierra View District Hospital in Porterville.[1] In the mid-1990's, while the present hospital building was under construction, the District solicited bids to develop (i.e., construct and manage) a medical office building of similar design on land the District owned across the street. It subsequently awarded the development contract to a limited partnership that was, or would become, known as Sierra View Medical Plaza Associates, LP (the Partnership).

The office building, completed in May of 1997, is a "two-story concrete tilt-up structure" with a "net rentable area" of some 29,000 square feet. The

---

[1] Porterville is in Tulare County. The matter was tried in Kern County because, as the court explained to the jury, it was a neutral forum.

structure itself was owned by the Partnership, and the underlying land was owned by the District. The District leased the land to the Partnership for a term of 45 years, with an option in the Partnership to renew the lease for an additional 10 years. The Partnership also had an option to purchase the land, beginning on the fifth anniversary of the effective date of the ground lease, and each year thereafter on the anniversary date.

The Partnership, as landlord, leased office space in the building subject to certain covenants, conditions, and restrictions (CC&R's) in favor of the District, including one restricting occupancy to doctors having privileges at Sierra Vista District Hospital. The District could waive this restriction, however, as indeed it did with respect to some if not all of the original tenants.

The District was itself a tenant in the building, leasing two offices totaling about 7,000 square feet for a blood lab and an outpatient surgery center, and another office of 2,500 square feet it subleased to a doctor. In addition, the District was, initially at least, part owner of a newly formed corporation known as the Sierra Health Network (SHN) (known later as the Valley Physicians Alliance) that leased about 5,650 square feet in the building before it, SHN, went out of business. The Partnership thereafter looked to the District for payment of the rent due for the remaining term of the SHN lease, based on what the Partnership claimed was a rent guaranty signed by the District. The District disputed this claim, which would become the subject of a separate lawsuit.

In 2001, the District, in an effort to reduce its expenses, attempted to renegotiate its leases with the Partnership to lower the rent. When the negotiations failed, the District told the Partnership it would not renew its leases when they expired in May of 2004. The District simultaneously undertook a study of its options for acquiring 13,000 square feet of space it projected it would need if the leases were not renewed. One of these options was to condemn the Partnership's interest in the office building. This was the option the District chose to pursue.

The District filed this condemnation action in December of 2001, and received an order of possession effective March 1st of the following year.[2] The sole issue at trial was the amount of compensation due the Partnership for its interest as of the date of valuation on January 7, 2002.

---

[2] The action as originally filed also named LaSalle National Bank, the holder of a $2.8 million mortgage on the building, as a defendant. The bank was dismissed from the case shortly before trial, after it and the District reached a settlement as to the value of the bank's interest in the building.

An appraiser retained by the Partnership estimated the Partnership's interest in the building had a fair market value of $4.3 million. The Partnership's managing partner testified to a figure of $4.8 million. The District's appraiser evaluated the interest at $2,825,000. He previously had appraised the interest twice, both times at the request of a local bank providing construction financing. In 1995, he estimated the interest's value at $4.1 million and, in 1996, at $3.9 million. He explained the large discrepancy between his early and later appraisals as stemming from instructions given him by counsel for the District to assume, for purposes of his new appraisal, that the District would not renew its leases to occupy the building when they expired in 2004.

The jury returned a unanimous verdict for $3.9 million. A judgment for this amount was entered in favor of the Partnership on February 26, 2003.

The Partnership moved to set aside the judgment and enter a different one (see Code Civ. Proc., § 663)[3] complying with statutory requirements for the award of interest and costs (§§ 1268.310, 1268.710), and as to form (§ 1235.130).

A few days later, the District filed a motion for new trial (§ 657) on the ground of juror misconduct. It claimed, based on declarations by four jurors, that the jury's verdict represented an amount it had determined the condemned interest was worth to the District in particular, rather than, as it should have, what the interest was worth to a disinterested buyer. The trial court agreed and granted the motion. The court's order stated:

"Admissible evidence of misconduct is submitted and received in the form of . . . declarations of four (4) of twelve jurors factually demonstrating that at least four (4), and evidently more jurors, disregarded the court[']s legal instructions, specifically BAJI 11.75 and 11.77, and based their verdict on a calculated value of worth to [the District] of the purpose for which the property interest is being acquired and calculated a fair market value based upon assumed future use, extent of use and discretionary acts in the future by the [District].

"The presumed prejudicial result of the misconduct is uncontroverted by any evidence from the [Partnership]. Further, the manner in which the jurors proceeded can only result in a higher valuation figure that [*sic*] the jurors would have otherwise determined."

The Partnership filed a timely notice of appeal.

---

[3] Unless noted otherwise, all future statutory citations will refer to the Code of Civil Procedure.

## DISCUSSION

The Partnership raises three issues on appeal. It contends the jurors' declarations fail to demonstrate misconduct; that the misconduct, if any, was not prejudicial; and that the declarations were inadmissible under Evidence Code section 1150 to show the jurors' subjective reasoning process.

■ "In ruling on a request for a new trial based on jury misconduct, the trial court must undertake a three-step inquiry. [Citation.] First, it must determine whether the affidavits supporting the motion are admissible. [Citation.] If the evidence is admissible, the trial court must determine whether the facts establish misconduct. [Citation.] Lastly, assuming misconduct, the trial court must determine whether the misconduct was prejudicial. [Citations.] A trial court has broad discretion in ruling on each of these issues, and its rulings will not be disturbed absent a clear abuse of discretion. [Citations.] [¶] . . . [¶]

■ "[J]ury misconduct is not reversible per se. Although jury misconduct does give rise to a presumption of prejudice, the presumption may be rebutted by the prosecution on the basis of the entire record. [Citation.] In deciding whether misconduct was prejudicial, the trial court must determine whether there exists a substantial likelihood that some extrinsic material or information improperly influenced the vote of one or more jurors. This is an objective standard. '. . . "In effect, the court must examine the extrajudicial material and then judge whether it is inherently likely to have influenced the juror." [Citation.]' [Citation.]" (*People v. Dorsey* (1995) 34 Cal.App.4th 694, 703–704 [40 Cal.Rptr.2d 384]; see also *People v. Ault* (2004) 33 Cal.4th 1250, 1272 [17 Cal.Rptr.3d 302, 95 P.3d 523]; 8 Witkin, Cal. Procedure (4th ed. 1997) Attack on Judgment in Trial Court, § 143, p. 644.)

*The Jurors' Declarations*

The declarations all said essentially the same thing. Three of the jurors concurred with the declaration of the fourth, the jury foreman, who asserted:

"3. That in arriving at the verdict, the jury openly considered and discussed the use of the subject medical office building for hospital space and for rental space;

"4. That the jury discussed and considered the cost approach in evaluating the hospital's [i.e., the District's] need for 13,000 square feet of space, and that the hospital would alternatively have had to construct a building of this size to meet its space needs;

"5. That the jury considered and discussed the rental value of the remaining 16,000 square feet and evaluated it on the income method utilizing a triple net per square foot value basis considering the hospital's ability to relax the CC&R requirements;

"6. That the ultimate verdict was achieved through open discussions concerning the respective values placed on the 13,000 square feet to be used for hospital purposes and the remaining 16,000 square feet to be used for rental purposes under the hospital's control[.]"[4]

The other three jurors, in addition to confirming the foreman's declaration, each added the following statement of their own: "3. In reaching our verdict, the jury openly discussed and considered the hospital's use of the building, and placed a higher value on the space to be used by the hospital than the remaining rental space[.]"

*Evidence Code Section 1150*

Evidence Code section 1150, subdivision (a) provides:

"Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined."

The Partnership maintains the jurors' declarations, insofar as they purported to explain what factors the jury considered in reaching its verdict, were inadmissible under Evidence Code section 1150 . (See, e.g., *Krouse v. Graham* (1977) 19 Cal.3d 59, 81 [137 Cal.Rptr. 863, 562 P.2d 1022] [absent evidence of express agreement by jurors to base verdict on improper factors, or of extensive discussions evidencing an implied agreement, assertion jurors privately considered the factors is inadmissible]; *Moore v. Preventive Medicine Medical Group, Inc.* (1986) 178 Cal.App.3d 728, 740–741 [223 Cal.Rptr.

---

[4] The "income method" is one of three commonly accepted approaches used in condemnation proceedings to determine the fair market value of property. It reflects the capitalized value of the net rental income the property is expected to generate. (*State of Cal. ex rel. State Pub. Wks. Bd. v. Stevenson* (1970) 5 Cal.App.3d 60, 63 [84 Cal.Rptr. 742].) The two other approaches look to the current cost of reproducing the property, less depreciation, and to recent sales of comparable properties. (*Ibid.*; see also Evid. Code, §§ 810–823.)

A "triple net lease" is one that passes on to the tenant all the maintenance and operating costs incurred for the leased property. (*Pate v. Channel Lumber Co.* (1997) 51 Cal.App.4th 1447, 1450 [59 Cal.Rptr.2d 919].)

859] [same]; *Tramell v. McDonnell Douglas Corp.* (1984) 163 Cal.App.3d 157, 172–173 [209 Cal.Rptr. 427] [same].)

The District contends, on the other hand, that the Partnership waived this objection by failing to raise it before the trial court. (See *Vikco Ins. Services, Inc. v. Ohio Indemnity Co.* (1999) 70 Cal.App.4th 55, 66–67 [82 Cal.Rptr.2d 442]; 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 394, p. 444.)

We will not decide this issue because, as will be seen, it is unnecessary for us to do so.

*Was There Misconduct?*

The Partnership maintains the jury was permitted, if not required, to consider the District's prospective uses of the office building because it was a "market participant," meaning the District was "a tenant of substantial space, the guarantor of additional space, a potential tenant of even further space, and a potential purchaser of all or a portion of the [building]." Thus, the Partnership concludes: "The juror declarations do not demonstrate a failure to follow the instructions. The declarations merely recite that the jury discussed evidence that was admitted at trial concerning the District's use and occupancy of the [building]. The District does not claim, and it cannot claim, that this evidence was improperly admitted. Since the evidence was proper and the declarations do no more tha[n] indicate that the jury discussed this evidence, the declarations cannot run afoul of the instructions. [¶] . . . [¶] The instructions . . . required jurors to consider the highest price that would be paid considering the most profitable use for which the [building] was adaptable and available . . . . All that the declarations demonstrate is that the jury considered nothing more than the [District's] use and occupancy of the [building] in valuing the [building]. [¶] The jury received testimony and was also instructed concerning valuation of the [building] based on its highest and best use. The testimony demonstrated that the current use, as well as the highest and best use, involved the [District] as a current tenant in the [building]. Additionally, the [District's] need for additional space and the [building's] proximity to the [h]ospital made the [building] the likely site for the District's additional space needs . . . . The highest and best use and fair market value instructions given to the jury also required it to consider the occupancy of the [building] based

on the District's ability and history of relaxing the [CC&R's]. In other words, the statements set forth in the declarations are merely statements of evidence admitted at trial and are consistent with the jury instructions." (Fn. omitted.)

■ An owner is entitled to "just compensation" for property taken for a public use (U.S. Const., 5th Amend.; Cal. Const., art. I, § 19; § 1263.010), as measured by the fair market value of the property (§ 1263.310). Fair market value is defined as "the highest price on the date of valuation that would be agreed to by a seller, being willing to sell but under no particular or urgent necessity for so doing, nor obliged to sell, and a buyer, being ready, willing, and able to buy but under no particular necessity for so doing, each dealing with the other with full knowledge of all the uses and purposes for which the property is reasonably adaptable and available." (§ 1263.320, subd. (a).) Fair market value refers to the highest and best use for which the property is geographically and economically adaptable. (*City of Los Angeles v. Decker* (1977) 18 Cal.3d 860, 867 [135 Cal.Rptr. 647, 558 P.2d 545] (*Decker*).)

■ Fair market value is to be determined in terms of what the property would be worth to a knowledgeable but disinterested buyer *in the general market*—a generic buyer as opposed to a specific one—as if there were no condemnation action. Put another way, " 'just compensation' contemplates compensation measured by what the landowner has lost rather than by what the condemner has gained." (*Merced Irrigation Dist. v. Woolstenhulme* (1971) 4 Cal.3d 478, 494 [93 Cal.Rptr. 833, 483 P.2d 1] (*Woolstenhulme*).) " 'The rule is, that the owner is entitled to the market value of his land, to be determined in view of all the facts which would naturally affect its value in the minds of purchasers *generally* . . . . "Any existing facts which enter into the value of the land *in the public and general estimation*, and [tend] to influence the minds of sellers and buyers, may be considered." [Citation.]' [Citations.]" (*Id.* at p. 493, italics added.)

■ "The fair market value of the property taken shall not include any increase or decrease in the value of the property that is attributable to any of the following: [¶] (a) The project for which the property is taken. [¶] (b) The eminent domain proceeding in which the property is taken. [¶] (c) Any preliminary actions of the plaintiff relating to the taking of the property." (§ 1263.330.) "*Woolstenhulme* clearly states that the value to the condemner cannot be used to calculate the value of the property to the property owner." (*People ex rel. Dept. of Water Resources v. Andresen* (1987) 193 Cal.App.3d 1144, 1156 [238 Cal.Rptr. 826] (*Andresen*); see 8 Witkin, Summary of Cal. Law (9th ed. 1988) Constitutional Law, § 1015, p. 576.)

These limitations are reflected in the following instructions, based on former BAJI Nos. 11.75 and 11.77, respectively, which were given to the jury in this case.

"You are not permitted to value the property with reference to what it was worth to the [Partnership] for speculation or merely for possible uses, nor what the [Partnership] claims it was worth to [the Partnership], *nor what it may be worth to the [District] for the purposes for which it is being acquired.*" (BAJI No. 11.75, italics added.)

"In determining the fair market value of the property, do not include any change caused by the project; that is, *the use which the [District] is to make of the property.* [¶] Do not include any change in value because the property is being taken by eminent domain proceedings; that is, any change based on speculation as to what the [District] ultimately may be required to pay in this proceeding. [¶] Do not include any change in value because of any preliminary action of the [District] relating to the taking of the property." (BAJI No. 11.77, italics added.)

We question the utility of at least the italicized portions of these instructions in the present case, where the historical use of the property by the condemner was the same as the proposed use after condemnation. The instructions, we think, were designed for different situations.

*Woolstenhulme* concerned a precondemnation increase in value attributable to the subject property's proximity to a proposed project. There, an irrigation district proposed to expand and improve an artificial lake it owned in a rural county. News of the proposal caused land in the vicinity of the lake, used then mostly for grazing, including Mrs. Woolstenhulme's land, to increase in value. The project, later finalized, included a portion of Woolstenhulme's property, and the district condemned it. The question then was whether Woolstenhulme was entitled to compensation for the increase in the value of her property which was due to public knowledge that the project would occur.

In arguing she was not entitled to that increase in value, the district relied on the usual rule that, in determining just compensation, one may not consider any increase in the value of property attributable to the project for which it is being taken. The Supreme Court affirmed this rule in situations where it is known or expected the property will be taken. (*Woolstenhulme,*

*supra*, 4 Cal.3d at pp. 490–491.) As explained in *Andresen*, *Woolstenhulme* rejects valuation based on speculation caused by the knowledge that certain property will be condemned: "[s]imply stated, purchasers of property that is known to be condemned are prevented from inflating the value of the property by conjecturing what the condemner will actually pay for the property."[5] (*Andresen*, *supra*, 193 Cal.App.3d at p. 1156.) There is no evidence here that any such speculation was a concern.

Another of the situations addressed by the instructions given also has no relevance here. In *East Bay Mun. Utility Dist. v. Kieffer* (1929) 99 Cal.App. 240 [278 P. 476], the landowner complained of error in the trial court's refusal to allow evidence concerning the selling price of water and electricity in connection with valuation of property condemned for use as a reservoir. In rejecting this assertion of error, the appellate court spoke of conjecture and speculation: "[T]he relation between the value of land in a proposed reservoir and the current price of water and electric energy is too remote and conjectural to be of any reliable assistance to the jury in determining the market value of the land taken." (*Id.* at p. 250.) The court could as well have noted that the attempt to use the price of resources available to the public agency because of the project, in order to value the property, would run afoul of the rule against using value to the condemner to establish fair market value. Again, no such situation is involved here.

The Partnership does not argue, however, that there was error in the giving of the noted instructions. The Partnership appeals only from the grant of a new trial. We therefore will assume in the remainder of our analysis that the jury properly was precluded from basing its verdict on the use to which the District would put the property after the condemnation was complete.

We need not, therefore, expend great effort in analyzing the Partnership's reliance on two cases: *Decker*, *supra*, 18 Cal.3d 860, and *Andresen*, *supra*, 193 Cal.App.3d 1144. Both of those cases addressed the question whether the condemning agencies' prospective use of the property could be used to show the property's highest and best use in the hands of the landowner or a generic buyer.

---

[5] *Woolstenhulme* distinguished the situation where property near a project is not at first expected to be taken: "[U]nder our just compensation clause, an owner of the condemned property should be compensated for the increase in value which his land has experienced in anticipation of the benefits of a proposed improvement, so long as it is not reasonably probable that the specific piece of property being evaluated is to be taken for the improvement." (*Woolstenhulme*, *supra*, 4 Cal.3d at p. 487.)

■ *Decker* and *Andresen*, like *Woolstenhulme*, are useful in the present case only in that they clarify the general rule by identifying situations in which it does *not* apply. The condemner's proposed use of property may be indicative of the property's value *to the owner or a generic buyer* on the assumption the owner could put it to the same use (*Decker, Andresen*), but its value to the *condemner* for that use is *not* a permissible measure of just compensation (*Woolstenhulme*). (See 4 Nichols, Eminent Domain (rev. 3d ed. 2004) § 12.03, pp. 12-90 to 12-93.) This, however, is *not* a highest and best use case; there is no question here that the highest and best use of the building is for medical offices. Thus, the fact the District would use it for that purpose is irrelevant.

Stripped of all these distractions, this case is simple. The jury was instructed: "You are not permitted to value the property with reference to . . . what it may be worth to the [District] for the purposes for which it is being acquired [i.e., for a medical office building]." (BAJI No. 11.75.)

■ This instruction did not require, however, that the jury disregard the District's *historical* use of the building. More particularly, the jury was not required to accept as true the District's assertion it would allow its lease to lapse in May of 2004, or the suggestion it would no longer waive the occupancy limitations in the CC&R's. Someone in the market for a medical office building in Porterville, in estimating what this one was worth, might reasonably have assumed the District would *not* move out because it would not have been in the District's interest to do so. Indeed, this appears to us to be what the jury believed as well.

The gist of the jurors' declarations was that the jury, in determining the fair market value of the building, assigned a higher value to the space occupied by the District than it did to the rest of the space in the building.

"[T]he jury discussed and considered the cost approach in evaluating the [District's] need for 13,000 square feet of space, and that the [District] would alternatively have had to construct a building of this size to meet its space needs; [¶] [T]he jury considered and discussed the rental value of the remaining 16,000 square feet and evaluated it on the income method . . . considering the [District's] ability to relax the CC&R requirements; [¶] [T]he ultimate verdict was achieved through open discussions concerning the respective values placed on the 13,000 square feet to be used for [the District's] purposes and the remaining 16,000 square feet to be used for rental purposes under the [District's] control . . . ."

". . . In reaching our verdict, the jury openly discussed and considered the [District's] use of the building, and placed a higher value on the space to be used by the [District] than the remaining rental space . . . ."

Thus, the jury evidently assumed that, had the condemnation not occurred, the District would have continued to occupy the building and would have continued to grant exceptions to the CC&R's with respect to the other tenants, just as it had done in the past. This, as we have said, was a permissible assumption. It was also a reasonable one under the circumstances. The jury could have surmised the District would renew its lease, and even lease additional space, when faced with the more expensive alternative of having to find or construct comparable space somewhere else. And, in fact, the District *was* paying a higher rent for its space in the building than the other tenants: about $2 a square foot, as compared to about $1.50. This was the reason for the meeting in April of 2001 at which the District said it would not renew its lease when it expired three years later unless the Partnership agreed to extend the lease for 10 years and reduce the rent to $1.25 a square foot (or to sell to the District all or part of the building).

The meeting took place between Kelly Morgan, the District's chief executive officer, and Randall Strada, the Partnership's managing partner. Strada, who refused the offer, testified he thought at the time Morgan was bluffing.

"Q. [District's counsel] So this would be more than three years before the lease was set to expire, he [Morgan] threatened you [Strada] that in three years I am going to move out?

"A. [Strada] Yes.

"Q. And what did he have to do in order to move out in three years, as far as his lease was concerned?

"A. Well, nothing with his lease. He would just use his lease for three years, and prior to moving out, of course, he would have to find suitable replacement space, build it out suitable for a hospital, move all—at least anticipate moving all the equipment and everything . . . he had a whole lot of stuff in that building. I told you earlier I didn't think he was going to do it. I thought he was bluffing. On the other hand, it wasn't his money. He could do that if he wanted to.

"Q. You thought he was bluffing?

"A. I took him seriously, but my instinct[s] were he wasn't going to leave that building, and he hasn't. [Strada gave this testimony on February 19, 2003.]

"Q. You thought he was bluffing when he made the threat?

"A. That entered my mind. I didn't think he was going to move out, but I had to take it seriously, yes. . . .

"Q. Three years down the road when the lease runs out, the hospital has done everything that it's contracted to do under the lease, it has no more lease obligations at the end of three years, and it finds other space. What is the threat in that to you?

"A. I didn't—it is not as easy for a hospital to move out of that building as it would be for a real estate office to pick up a desk and get new phone service. Their own study says they are going to spend millions of dollars to do other things if they don't stay in this building. I didn't know what exactly it would cost them, but I knew it would cost them a lot.

"Q. Why did you think that was a threat to you as opposed to a stupid statement on his part?

"A. Maybe I thought it was both.

"Q. Well, why was it a threat?

"A. Well, maybe it is a definition of the word threat if your biggest tenant tells you if you don't do what I want, I'm going to move out. That seems like a threat to me."

We understand the jurors' declarations to say only that they too thought Morgan was bluffing. This was their prerogative. It follows there was no violation of the instructions given, and that the trial court erred in granting the District's new trial motion.

## DISPOSITION

The order granting the District's motion for new trial is reversed. The matter is remanded to the trial court with directions to enter an order denying the motion. The Partnership is awarded its costs on appeal.

Cornell, Acting P. J., and Gomes, J., concurred.

On February 3, 2005, the opinion was modified to read as printed above. Respondent's petition for review by the Supreme Court was denied May 11, 2005.